The Penn. Del. and Md. Steam Navigation Co. *vs.* Dandridge.—1836.

THE PENNSYLVANIA, DELAWARE, AND MARYLAND STEAM NAVIGATION COMPANY *vs.* WILLIAM H. DANDRIDGE.— *December*, 1836.

The declaration stated that the defendants in consideration of the sum of $33 33, to be paid by the plaintiff to the defendants, undertook safely and securely to take a certain schooner or vessel on board which the plaintiff had laden, "certain goods, chattels, wares, and merchandise, from, and out of the ice, and from and out of the harbour and Port of Baltimore," &c. which goods, &c. it was alleged, were lost in consequence of the neglect and refusal of the defendants to perform their promise. *Held*, on motion in arrest, after verdict, that the declaration was defective, because it did not allege any consideration for the defendants' promise; no agreement or promise on the part of the plaintiff to pay the $33 33, being averred. 2d. That upon the case made by the declaration, it was not necessary to allege the payment of the money; the performance of the defendants' agreement, being a condition precedent to their right to demand the remuneration. 3d. That the general description of "goods, chattels, wares, and merchandise," was insufficient, and that a definite description should have been given of the cargo.

Where the declaration charges, that the injury sustained by the plaintiff, is the result of the total neglect and refusal of the defendant to perform his engagement; evidence of a negligent and imperfect performance is inadmissible, and by implication contradictory of the charge. Under such a declaration the right of the plaintiff to damages is limited, to such as naturally result from the defendants' total neglect and refusal to perform his contract, and they cannot be inflamed by evidence of a negligent performance.

A declaration which alleges a contract to tow a vessel and cargo out, safely and securely, is not supported by proof of a contract to tow out free from a particular description of danger.

In the one case, the contract would cover a loss from any and every cause, while in the other, there could be no recovery, unless the loss arose from the danger particularly named in the contract.

*Quere*, whether a declaration alleging an act to be performed in consideration of the payment of $33 33, is sustained by proof that $33 33⅓ was the sum to be paid?

Since the act of 1825, ch. 117, questions of variance between the allegation and the proof cannot be raised in this court, unless they were made in the court below.

The agent, a stockholder, of an incorporated company, (the defendant in the action,) who made the contract with the plaintiff, is not a competent witness for said company in regard to such contract. In such a case, the witness has a direct interest in the event of the suit, independently of his acts as agent.

All the surrounding circumstances of the transaction should be submitted to the jury, provided they can be established by competent means, and afford

any fair presumption or inference as to the question in dispute. And in deciding upon the admissibility of such circumstances, it must be assumed, that the evidence proposed to be given would establish them to the satisfaction of the jury.

Where the general object and design of a charter is to create a company to transport passengers and merchandise from B. to P. and the company appoints an agent, such agency, unless otherwise proven, is limited to the business of the company, connected with, or relating to such object and design.

Where a company was incorporated, " for the purpose of establishing and conducting a line or lines of steamboats, vessels, and stages, or other carriages, between P. and B. for the conveyance of passengers, and transportation of merchandise and other articles," a contract by such company, for the breaking of ice and towing vessels through the track thus broken, such vessels being bound for V. is invalid, and cannot be enforced against them.

Corporations are not only incapable of making contracts which are forbidden by their charters, but in general they can make none, which are not necessary, either directly or indirectly to effect the objects of their creation.

It is no ground for refusing a prayer that the party has asked of the court, less than he was entitled to.

The circumstance that a corporation has entered into a contract, does not estop it from denying its competency to do so in an action brought against it, founded upon such contract. If such was the case, in reference to the corporation, the estoppel would apply equally to the other contracting party, and thus in effect, limitations upon the powers of corporations would be of no avail.

If the defendants in this case had been, by their charter, authorized to make with the plaintiff a contract to take the vessel, on board of which his merchandise was laden, through the ice, and there was no express agreement that they would be responsible to the plaintiff, for all losses or injuries which might arise, if the said vessel was not carried through in safety ; then the defendants were only bound to use reasonable efforts, care, and diligence, and not bound to the extent of common carriers.

In such case if the loss does not result from the want of care and diligence on the part of the defendants, but from the default or omission of the agents of the plaintiff to avail themselves of the means of safety, when fully apprised of the danger to which the property is exposed, the defendants would not be liable.

The county court in instructing the jury, as to the facts which it would be necessary to find, to shew an adoption and ratification by the defendants, of the contract alleged to have been made by their agent, said, that if the consideration for such contract had been received by the agent, and paid over to the defendants, who retained the same, that then the said facts are in law an adoption of the contract, and as binding on them as if a previous authority had been given the agent. This instruction was held to be erroneous ; first, because the jury were not required to find, that the defendants *knew* on what account the money was paid them,—and second, that the defendants knew the terms of the contract on which the money was received.

The Penn. Del. and Md. Steam Navigation Co. *vs.* Dandridge.—*1836.*

APPEAL from *Baltimore* county court.

This was a special action of trespass on the case com-
menced by the appellee against the appellants, on the 31st
December, 1831, in which he declared, for, that whereas,
heretofore, to wit : on, &c. at the city and port of *Baltimore*,
to wit : at, &c. the said plaintiff safely and securely loaded in,
and upon a certain schooner or vessel called the *Hunter*, certain
goods, chattels, wares, and merchandise, of great price and
value, to wit : of the price and value of five thousand *dollars*,
current money, of him the said plaintiff, to be carried and
conveyed on board of, and by the said schooner or vessel, to
foreign parts beyond seas, to wit : to the *State of Virginia ;*
and the said schooner or vessel being, and there, to wit : on,
&c. at, &c. so loaded with the aforesaid goods, chattels,
wares, and merchandise, of him the said plaintiff, and ready
to sail and proceed on her said voyage, was delayed and
detained from proceeding on her said voyage, in consequence
of the gathering of ice in the *Patapsco river and Chesapeake
bay*, and the obstruction of the navigation of the said river
and bay thereby, to wit : at the county aforesaid ; and they,
the defendants, in this action, well knowing the premises,
afterwards, to wit : on the day and year aforesaid, at the
county aforesaid, undertook and faithfully promised the said
plaintiff, that they, the said defendants, for and in considera-
tion of the sum of thirty-three dollars and thirty-three cents,
to be paid by the said plaintiff to the said defendants, would
safely and securely take the said schooner or vessel, so loaded
as aforesaid with the goods and chattels of the said plaintiff,
from and out of the ice, and from and out of the harbour and
port of *Baltimore* aforesaid, to and at such point or place of
safety, in the said river or bay, below where the same was
frozen, and below where the navigation thereof was obstructed
by ice, as aforesaid, by breaking the said ice and towing the
said schooner or vessel to such point or place of safety as
aforesaid.   Yet the said defendants not regarding their said
promise and undertaking, and not regarding their duty in this
behalf; afterwards, to wit : on the day and year aforesaid, at

the county aforesaid, neglected and refused so to do, although thereto requested by the said plaintiff; whereby, and by reason of the negligence and improper conduct of the said defendants and their agents, the said schooner or vessel was injured, stranded and lost, and the aforesaid goods and chattels, wares, and merchandise of the said plaintiff became and were greatly broken, damaged and destroyed, and wholly lost to the said plaintiff, to wit: at the county aforesaid; wherefore the said plaintiff saith he is injured and hath sustained damage by reason of the non-compliance by the said defendants, of their said contract, to the value of five thousand dollars, like current money, and therefore he brings suit, &c."

The defendants pleaded that they did not undertake or promise in manner and form as, &c. on which issue was joined.

The verdict being for the plaintiff, the defendant moved in arrest of the judgment, and assigned the following reasons in support of their motion:

1. Because the plaintiff's declaration in this cause does not show or allege any consideration for the defendants' undertaking and promise therein declared upon.

2. Because the plaintiff's declaration in this cause alleges, that the promise of the defendants' declared upon, to carry out safely the *Hunter*, and the plaintiff's goods on board of her, was made for and in consideration of the sum of thirty-three dollars and thirty-three cents, to be paid by the plaintiff to the defendants; and it is not shown or averred in said declaration, that the said sum ever was paid to the defendants or any one for them.

3. Because the plaintiff's declaration in this cause alleges the defendants' promise, and the consideration therefor, in the manner stated in the second reason above; and it is not averred in or shown by said declaration, either that the plaintiff ever paid said consideration to the defendants, or any one for them, or that the plaintiff ever promised to pay said consideration to the defendants, or was under any obligation to pay the same to the defendants, or any one for them.

4. Because said declaration does not sufficiently describe the property of the plaintiff on board the *Hunter*, nor shew the number, kind, and quality of the goods.

These objections were over-ruled by the county court, (*Archer, Ch. J.*) and judgment rendered for $2,347 79½.

1st EXCEPTION.—At the trial of this cause, the plaintiff, to support the issue on his part joined, by *Jones* proved, that in the month of December, 1831, the plaintiff had in the harbour of *Baltimore*, two vessels, one of which called the " *Independence*," belonged to the plaintiff, and the other called the " *Hunter*," was chartered by the plaintiff, who was a resident of *Virginia*, for the voyage to *Baltimore*, and back again to the *Rappahannock*, in *Virginia*. That whilst the said vessels were lying in the harbour of *Baltimore*, the navigation of the *Patapsco river* became so obstructed by ice that the said vessels were unable to get out of said harbour into the *Chesapeake bay*, and that whilst they were thus detained in said harbour, an arrangement was set on foot for securing the aid of steamboats in cutting through the ice, and towing out into the bay, vessels detained by ice in said harbour. That the plaintiff having heard that such an arrangement was in progress, and being then confined to his room by severe indisposition, applied to the witness, his friend, and requested the witness, as his, the plaintiff's agent, to contract for towing out his said two vessels, and that he, the witness, as such agent, having heard that the arrangement for so towing out vessels, was being made, with the *agents* of the defendants, having the charge and management of the line of steamboats established and conducted by the defendants between *Baltimore* and *Philadelphia*, applied for the purpose of making a contract to have the said vessels of the plaintiff towed out, at the office kept by said agents in the city of *Baltimore*, and that he, the witness, as the agent of the plaintiff, there contracted with *Hugh McElderry*, as the agent of the defendants, for the towing out of plaintiff's said vessels. That at the time of said contract, he, the witness, informed *McElderry*, that one of the vessels, to wit: the *Hunter*,

which was the smallest, had a cargo on board, and agreed to pay him thirty-three dollars and a third, for the transportation of each of said vessels, and that therefore *McElderry*, as the agent of the defendants, agreed with witness, as the agent of the plaintiff to take the said vessels (the *Hunter* being so loaded,) from the harbour of *Baltimore*, through and out of the ice, free of damage of ice.

The plaintiff then *offered* to prove by said witness, that shortly afterwards, and on the *Thursday* afterwards, the steamboat *Independence*, owned by the defendants and the steamboat *Maryland*, employed by the said agents of the defendants, having collected the vessels to be towed out, to the number of fifteen or sixteen, began the proposed expedition, the *Independence* going ahead to break the ice and the *Maryland* following with the vessels in tow, and that the said two vessels of the plaintiff, the *Hunter* and the *Independence*, were in the line of the vessels so taken in tow, and in or near the rear of the line. That the said steamboats and the vessels taken in tow, made their way in safety through the ice, to a place called *Hawkins' Point*, several miles distant from *Baltimore ; Jones*, the witness, being on board the schooner *Independence*, belonging to the plaintiff—that at said last mentioned place, the vessels were detained for some time, by the stoppage of the steamboats, and that whilst there, a *Mr. Wilson* came on board the said vessel in which the witness was, to collect the sum above mentioned, as contracted to be paid by the witness as the plaintiff's agent, for the transportation of his said two vessels. That *Captain Gundry*, the captain of said schooner *Independence*, then objected to the payment being made, and remarked to witness, in the presence of said *Wilson*, " you are not going to pay until we are carried out," and that said *Wilson*, in reply, then assured them, that they had already gone through the thick ice, and they were nearly out of the ice, that there could be no doubt about their getting out safely, if they would make secure the fasts which connected them with the vessel preceding them in the line, and that thereupon the witness paid said *Wilson*

the money so contracted to be paid by him, for the transportation of both of said vessels. The plaintiff further offered to prove by said witness, that shortly after the payment of said money, and on the same evening the vessels again got under weigh, and that after they had gone a mile or two from the place at which they had stopped, just after night-fall, the fasts of the second vessel ahead of the vessels of the plaintiff, in the line of vessels which the *Maryland* was then towing out, gave way, and that the vessels whose fasts gave way, cast off the fasts of the vessel behind her, as did the latter vessel cast off the fasts of the plaintiff's vessel, the *Independence*, and both made sail to overtake the line of vessels ahead, that the plaintiff's vessels made the same efforts, but the wind being light, the night very cold, and the ice forming very fast, they were unable to make any progress, although they hoisted sails, and made efforts to go ahead—that the plaintiff's vessels being thus left in the ice near dark, they remained there until some time in the night, when the steamboat *Maryland* returned up the track, and came alongside of the plaintiff's vessels—that the witness then applied to *Captain Taylor*, the captain of the *Maryland*, and most earnestly and repeatedly entreated him to take the plaintiff's said vessels out of the ice, to which *Taylor* replied that he could not, for any sum of money, as he must be in *Baltimore* that night. That witness being then very much alarmed at the situation of said vessels, which he believed to be in great danger, then repeatedly and earnestly requested *Taylor* to take the vessels back to *Baltimore*, and offered *Taylor*, he believed, the sum of one hundred dollars to do so, and that *Taylor* refused either to take the vessels out of the ice, or to bring them back to *Baltimore*—that witness having his brother-in-law, a blind man, on board with him, and being very much alarmed about his situation, if left in the ice, applied to *Taylor* to bring them up back to *Baltimore*, in the *Maryland*, which he agreed to do ; that witness and his brother-in-law accordingly went on board the *Maryland*, and that the *Maryland* then went up the track about a quarter of a mile, where she lay in the ice all night.

The plaintiff further *offered* to prove by *Captain Gundry*, a proper and competent witness examined in his behalf, that he was the captain of the plaintiff's schooner *Independence*, and on board of her as such, at the time mentioned by the witness, *Jones*, when the said vessel and the schooner *Hunter* were taken in tow by the steamboat *Maryland*, to be towed from the harbour of *Baltimore*, through and out of the ice— that the steamboat *Independence* went ahead to break the ice, and the *Maryland* followed with the vessels in tow—that about two hours before sun-down on *Thursday*, the ————, the day on which they left *Baltimore*, they reached *Hawkins' Point*, and remained there until near sun-down, for what purpose the witness did not know.    That whilst there, *Taylor*, the captain of the steamboat *Maryland*, came along the line of the vessels, and told the captains of the vessels, and witness among others, that they must secure their vessels by sufficient fasts, and he would take them out of the ice in the course of two hours, and that witness went to work to secure the fasts of his vessel, and secured them in the best possible manner. That shortly afterwards, a person came on board his vessel, to collect the money to be paid for carrying out the *Hunter* and *Independence*, and applied for it to *Jones*, the witness, on board the witness' boat, and that witness objected to paying until they were out of the ice, but that upon said person's assurance that they were then nearly through the ice, and there was little, if any, doubt about their being carried out in safety, the money was paid by *Jones* to said collector—that about sun-down, the vessels again got under weigh, and that after they had proceeded a short distance, when just after night-fall, the fasts of the second vessel ahead, gave way, and she, and the vessels immediately in her rear, successively cast off their fasts, and made sail in the manner stated by the witness, *Jones*, and that the fasts of the witness' vessel being thus cast off, he hoisted sail, and made every effort to follow, but without success; that his efforts to get out without assistance proving fruitless, his vessel, and the *Hunter*, and the *Blackbird*, remained in the track near each other until the

return of the *Maryland* up the track—that the *Maryland* returned about midnight the same evening, and stopped within one hundred yards of them, when witness having made his fasts ready to attach his vessel to the *Maryland*, asked *Taylor*, the captain of the *Maryland*, if he was ready— to which he replied, " for what,"—and witness replied, " to take them out." That *Taylor* then said, " no, he would not do it," and asked witness why he did not make his fasts good and hold on—and that witness replied, that he did, but that the fasts of the second vessel ahead gave way. That *Taylor* then began to break the ice around the witness' vessel, to get by, when witness and *Jones* repeatedly and earnestly besought *Taylor* to take them out of the ice, which he refused to do; and that they then repeatedly and earnestly besought *Taylor*, for justice, for mercy, for humanity's sake, either to take the vessels out of the ice, or to bring them back to *Baltimore*, and that *Taylor* refused to do either. That *Jones* offered *Taylor* one hundred dollars to bring the vessels back to *Baltimore*, which *Taylor* also refused, and then stated that the steamboat *Independence* coming up the track, and would take them up to *Baltimore*. That witness then said, " we'll starve here," to which *Taylor* replied, that he would give them provisions, and did accordingly furnish them with some provisions. That *Jones* then applied to *Taylor* to take himself and his brother-in-law, a blind man, back to *Baltimore*, in the *Maryland*, to which *Taylor* agreed, and they accordingly went on board the *Maryland*, and she went on up the track towards *Baltimore*, and lay all night in the ice about a quarter of a mile above. The plaintiff further offered to prove by the said last mentioned witness, that on the next evening, being *Friday*, the said steamboat *Independence* came along up the track, on her return to *Baltimore*, and that he, the witness, made the same appeal to the captain of that boat which were made to *Taylor*, to induce the former either to take the plaintiff's said vessels, the *Independence* and *Hunter*, out of the ice from *Baltimore*, or to take them back to *Baltimore*, and that he also refused to do either, as

*Taylor* did.   That on *Thursday* night they had hoisted sails and made all the efforts to get out which they could make, but that on that night it was so very cold, and froze so rapidly, that on *Friday* morning the track which had been opened the day before, was completely frozen over, and covered with ice, so thick and hard that the men were able to walk on it, and did walk on it all day on *Friday*, and that they lay in the ice all *Friday*, without making any further efforts to get out, which they considered useless.   That on *Saturday*, the crews of the *Independence* and the *Hunter* recommenced their efforts to get out, when about daylight a violent storm came up, in the course of which the *Hunter* was driven against the *Independence*, and broke her bowsprit, and came alongside and unshipped her rudder—that during the storm, the crew of the two vessels made efforts to get some of the articles out of the *Hunter* into the *Independence*, but only succeeded in getting a small quantity of provisions.   That the storm continued with great violence, and about three o'clock in the day, the said two vessels being then near the edge of the ice, and in the floating ice, the *Hunter* was so much injured that witness thought it would be risking the lives of the crew to leave them on board of her ; and deeming it necessary for the safety of his vessels, to make a place for shelter, and to abandon the *Hunter*, he took the crew of the latter on board of his vessel, leaving the *Hunter*, was out of sight of her in five minutes, and has never seen her since.

The plaintiff further *offered* to prove by *John O. Treacle*, a competent witness on his behalf, that he was the captain of the said schooner *Hunter*, at the time spoken of by the witnesses, *Jones* and *Gundry*, when said vessel, with the *Independence*, commanded by *Gundry*, and several others were taken in tow by the steamboat *Maryland*, to be towed out of the harbour of *Baltimore*, through the ice, in December, 1831—and that the *Hunter* was then loaded with goods for the plaintiff, and had been chartered for the voyage from *Virginia* to *Baltimore*, and back again, to the plaintiff by the witness' father, who was owner of said vessel—that his said

vessel and the *Independence*, whilst being towed out by the *Maryland*, were left behind in the track, below *Hawkins' Point*, and in the manner stated by the witness, *Gundry*— that on the return of the *Maryland*, during the night, up the track to *Baltimore*, application was made to *Captain Taylor*, of the *Maryland*, to take the said vessels out of the ice, in the manner stated by the witnesses, *Jones* and *Gundry*, which *Taylor* refused, and said he had some vessels to take back to *Baltimore*. That *Jones* then asked *Taylor* to take the said vessels back to *Baltimore*, and offered him one hundred dollars to take them back, but *Taylor* still refused, and said the *Independence* would take them back. That on the next evening, being *Friday*, the steamboat *Independence* came along up the track, on her return to *Baltimore*, having vessels in tow, and that application was made to the captain of that boat also, either to take the *Hunter* and the *Independence* out of the ice from *Baltimore*, or to bring them back to *Baltimore*, who refused to do either, as well as *Taylor*, of the *Maryland*. That on *Thursday* night, when they were left in the track they hoisted sails, and made every effort to get out, but made no progress, the wind being light, the night extremely cold, and the ice making very fast, and on *Friday* morning the track was frozen over, so that the hands of the two vessels walked upon the ice made in the track, and that they lay in the ice all *Friday*, without making any progress—that on *Saturday* morning they renewed their efforts on board both of said vessels to get out of the ice, about daylight, when a violent storm came up, in the course of which the *Hunter's* rudder was lost, and her bowsprit and night-heads broken, and also her lower rudder irons. That the *Hunter* continued alongside of the *Independence* until about three o'clock in the day, when *Captain Gundry*, of the latter vessel, said he must leave the *Hunter*, and try to get to some place of shelter, to save his own boat—and that witness with the crew of the *Hunter*, then got on board the *Independence* for the safety of their lives, and the *Independence* cast off the *Hunter*, and was soon out of sight. That during the storm, efforts were made

to get some of the goods out of the *Hunter*, which proved unavailing, and that when it was found that it would be necessary to abandon the *Hunter*, and that there was no chance for saving her, the witness stripped her of her sails, and secured her cable and one of her anchors—that at the time when the witness left the *Hunter*, the water was nearly up to the cabin floor, and the pump frozen—and that the *Hunter* belonged to the witness' father, and was not insured, and her loss was a total loss to him.

To the introduction of all of which testimony so *offered* by the plaintiff to be proved by the said witnesses, *Jones, Gundry, and Treacle*, the defendants, by their counsel, objected.

1. As inadmissible generally under the pleadings in this action.

2. As inadmissible for the purpose of establishing for the plaintiff any claim to damages for the loss of his goods on board the schooner *Hunter*, in the manner proposed to be proved, inasmuch as the plaintiff's declaration declares on such loss as resulting directly from a total non-performance on the part of the defendant, of his contract to carry the *Hunter* through the ice, and the proof offered is of a loss of said goods resulting from an imperfect or negligent performance of the contract when it was in part executed.

3. As inadmissible for the purpose next above mentioned, because the loss alleged in the plaintiff's declaration is therein stated to have resulted directly from the defendants' neglect or refusal to perform his contract, and the proof offered is of a loss of said goods resulting from the action of a storm as its proximate cause, and there is no averment in said declaration, of the existence or action of said proximate cause, so as to let in proof of it, or of the defendants' alleged neglect or violation of contract, by which he exposed said vessel to the action of such proximate cause.

But the court over-ruled all said objections and admitted said evidence. The defendants excepted.

2ND EXCEPTION.—In addition to the testimony stated in the preceding, the defendants' first bill of exceptions, the

plaintiff's witness, *Jones*, on cross examination, further stated that at the time he made his contract with *McElderry*, as to towing out the *Independence* and the *Hunter*, *McElderry* was making out a list of the vessels to be towed out, and that the witness gave *McElderry* the names of his vessels to be put down, with the sums to be paid by him ; that witness had no conversation with *McElderry*, as to the origin or character of the enterprise, and never heard him intimate a doubt about its success.    That he was positive that *Taylor* never asked him to let him (*Taylor*,) bring the said vessels back to *Baltimore*, when he, *Taylor*, was returning with the *Maryland*, up the track, and that, on the contrary, witness repeatedly urged *Taylor* to bring them back, and even offered him a reward for so doing, which *Taylor* refused.    That the *Maryland* had no vessel in tow on her return, and at the time when she came up to the vessel in which the witness was, but that after she passed the *Independence* and the *Hunter*, and just above where she lay in the ice all *Thursday* night, she took several small vessels in tow, principally wood boats, and that he was quite confident that the *Maryland* brought no vessel from below the boat in which witness was.    That the *Hunter* and the *Independence* could not get up on *Thursday* night to where the *Maryland* lay all night, as the ice was making very fast, and that he, witness, never applied to the defendants, or their agents for the return money which he had paid as before stated, for taking out the said vessels.

The plaintiff's witness, *Gundry*, also stated, on cross examination, that he did not recollect, that whilst the vessels were lying at *Hawkins' Point*, *Taylor*, or any one else told them to make their fasts secure, for if they got loose he could not wait for them.    That *Taylor* had no vessel in tow, when on his return up the track in the *Maryland*, he came up to the plaintiff's boat.    That he assisted in stripping the *Hunter*, and saw no water in her, but did not examine her ; that she had three or four hands with the captain.    That the *Hunter* was stripped just before the *Independence* parted with her, and that the latter parted with her at the edge of the ice.

That the *Independence* was a larger vessel than the *Hunter*, and was nearly empty, and could have taken the goods in the *Hunter*, and have carried them easily, if they could have gotten them out of the *Hunter*, and that he was confident that both *Taylor* and the captain of the *Independence* were frequently requested to bring the vessels back to *Baltimore*, and refused to do it.

The plaintiff's witness, *Treacle*, also stated, on cross examination, that the *Independence* left the *Hunter* when they were in the broken ice; and that after leaving her, the *Independence* took shelter under the high lands of *Magothy*. That when *Taylor* was on his return in the *Maryland*, he had one vessel in tow, and that he said there were also vessels above, which he, *Taylor*, had to take back to *Baltimore*. That *Taylor* positively refused to take the vessels back to *Baltimore*, but said he would come down for them next morning. That witness had on board his vessel, the *Hunter*, two hands besides himself and a working passenger.

The plaintiff then *offered* evidence, that under an agreement with *McElderry*, as the agent of the defendants, that it should not prejudice his rights; he, the plaintiff having heard that the *Hunter* had gone on shore on *Kent Island*, appointed agents to secure the cargo as far as practicable, and to dispose of it to the best advantage, if so damaged as not to justify the return of it to *Baltimore*. That the *Hunter* went on said shore on the evening of *Saturday*, and when examined, was found to have one or two holes in her stern, through which the tide was ebbing and flowing, the examination being made a day or two after she went ashore. The plaintiff also proved that the cargo secured by the said agents, being in a damaged state, was disposed of to the best advantage at *Chestertown*, and the net proceeds of the sale, deducting all expenses, was sixteen hundred and forty-four dollars and twenty one cents. It was also admitted, that the value of the plaintiff's goods on board the *Hunter*, at the time of her being left by the *Independence* and her crew, was $4,000.

The plaintiff then proved by *William H. Gatchell*, a com-

petent witness on his behalf, that in December, 1831, the said *Hugh McElderry* was the general agent for the defendants, and as such, made contracts for the transportation of goods and passengers by the *Citizens Union Line of Steamboats*, a line of boats established and carried on by the defendants, between *Baltimore* and *Philadelphia*, and that the boat *Independence* was one of the boats employed by the defendants in that line, and that the transportation of goods and passengers between *Baltimore and Philadelphia*, or to any intermediate point, on the route of their said line, was the ordinary business of the defendants in the conduct of said line.

The defendants then *offered* to examine the said *Hugh McElderry*, with whom the witness, *Jones*, had stated that he had made for the plaintiff, the contract declared upon in this action; but it being admitted that the said *McElderry* was a stockholder of *The Pennsylvania, Delaware, and Maryland Steam Navigation Company*, the defendants in this action, the plaintiff, by his counsel, objected to the examination of said *McElderry*, but the defendants, by their counsel, contended that he was a competent witness, to prove what contract he did make as the agent of the defendants, with *Jones*, as the agent of the plaintiff; but the court were of opinion that *McElderry* was an incompetent witness, and that his testimony was not admissible in this case, even for the latter purpose, and accordingly would not permit the defendants to examine him for said purpose. The defendants excepted.

3D EXCEPTION.—After the evidence stated in the defendants' preceding bills of exception had been offered, the defendants proved by *Captain Lemuel Taylor*, (he having been first duly released by the defendants,) that in December, 1831, at the time when the contract, offered in evidence by the witness, *Jones*, is stated to have been made, he, *Taylor*, was the captain of the steamboat *Maryland*; and that on *Wednesday*, the ——— of December, 1831, *Mr. Meeteer*, the president of the *Citizens Union Line*, sent for witness to

engage his services and the services of his boat, the *Mary-land*. That before the witness went down to the office of the *Citizens Union Line*, *Jones*, the witness called on the witness, *Taylor*, and wanted to make a bargain with him about towing out the schooners *Hunter* and *Independence*, above mentioned. That witness informed *Jones*, that he had just received a note from *Mr. Meeteer*, to engage the assistance of the *Maryland*, in towing out the vessels on the proposed expedition, and that he, witness, had nothing to do with making the bargain for towing out the vessels, and that witness directed *Jones* to go for that purpose to the office of the *Citizens Union Line*. That shortly afterwards, witness went down to said office, and there found *Jones* in conversation with said *Meeteer*, about towing out said vessels. That *Jones* then stated to *Meeteer*, that he wanted to make a contract about towing out said vessels, to which *Meeteer* replied, that he did not know that there would be a sufficient number of vessels to induce them to undertake it. That *Jones* then said to *Meeteer*, "he might set him, *Jones*, down for two vessels," and that *Meeteer* then stated to *Jones*, that there was a doubt, whether the company would succeed in the effort if made, although he thought they would, but that the company would not be at any risk, nor responsible for the property. The defendants further proved by said witness, that having contracted with *Meeteer* to give the aid of his boat, in the attempt to tow out the vessels, he, witness, went to work to prepare for the expedition, and to collect the vessels, and that on *Thursday* morning, about eight or nine o'clock, they set out, the *Independence* going ahead to break the ice, and the *Maryland* following, having the vessels in tow. That after they had proceeded about a mile, the wind rose, and pressed the vessels in the rear of his stern, to the danger of his own boat, so that the witness was obliged, for the safety of the *Maryland*, to let go the vessels, which then made sail, and followed after him in the track, for five or six miles, and until they got to, or near to *Hawkins' Point*, where *Captain Trippe*, of the *Independence*, stopped to get a supply

264     CASES IN THE COURT OF APPEALS

The Penn. Del. and Md. Steam Navigation Co. *vs.* Dandridge.—1836.

of wood for his boat; that the vessels all lay there for some time, being then, as witness thinks, within a mile and a half, or two miles of the edge of the ice, and that he, witness, then went along the lin? of the vessels, including the *Hunter* and the *Independence,* and directed the captains of the vessels to make their fasts secure, as his situation would be such, that if their fasts gave way he could not wait for them. That near dark the *Maryland* set out again from the place at which they had so tarried, having the vessels in tow, (including the *Hunter* and *Independence,)*—that he, witness, had no knowledge that any of them had broken loose, or were left in the track, until he found them in the track, upon his return. That the *Maryland* got through the ice about eleven o'clock at night, on *Thursday* night, and after the vessels were out of the track, that the witness immediately returned with the *Maryland,* up the track, whilst *Captain Trippe* with the *Independence,* and a vessel which he had in tow, went to *Annapolis.* That a short distance below where the vessels left, were, the *Maryland,* on its return, stopped in the track, to take in tow a boat which lay in the ice, at a distance of fifty or a hundred yards from the track, to get which in readiness to be towed, the *Maryland,* on her way down, had left a person who went down in the *Maryland,* at the instance of the owners, to assist in endeavouring to have said boat towed up. That after the *Maryland* had got this boat in tow, she went on up the track, until she encountered the vessels left, including the plaintiff's said vessels—that the witness, not knowing that any vessels had been left, as he approached them, remarked that here were stragglers in the track, and on being hailed by the witness, *Jones,* witness asked what they were doing there, to which *Jones* replied, that they had been left; and on witness asking why they had not secured their fasts, *Jones* replied that they had. That witness was then urged by *Jones,* to take the plaintiff's vessels out, but refused, and assigned, amongst other reasons for his inability to do it, the injured condition of his boat, the *Maryland.* That witness, however, then offered to bring the

said vessel back, and would have done it with great cheerfulness, but that this was declined by *Jones*, and that although the *Maryland* then lay alongside of, or near to the *Hunter* and the *Independence* for some time, *Jone*      nd the captains of the said  vessels, not only never asked the witness to bring the vessels back to *Baltimore*, and never made any effort to fasten their vessels on to the *Maryland* for that purpose, but actually refused to be brought back. That whilst there, the witness supplied one of said vessels with some provisions, and told them that the track was clear, and that if they would hoist sails, and make exertions, they could get out, but they made none as far as the witness saw. That after the *Maryland* passed these vessels, she went up the track about three hundred yards, where, the vessel being injured, the witness deemed it prudent to lay by all night. That witness, with the *Maryland*, then took in tow other vessels, to take them to *Baltimore*, amounting in all, with that brought up, to six, for which he received only one hundred and six dollars. The said witness, *Taylor*, further proved, on cross examination, that he told *Mr. Meeteer* that he thought the vessels could be towed out, as it had been done before—that he did not recollect seeing any of the captains of the other vessels there, at the time of *Jones*' conversation with *Meeteer*, testified to by witness; that the *Independence* was better prepared than his boat, for getting through the ice. That the buckets of his boat were much injured by the ice striking against them, and that the pay received was scarcely sufficient to pay the damage actually sustained. That he did not tell *Jones* or the captains of the *Hunter* and the *Independence*, when on his return up the track, that he would come back for them, but then offered to take them up to *Baltimore*, and that he did not tell them that the *Independence* would take them up, but that the *Independence* would be along, and would keep the track open. When he came up to the vessels, on his return up the track, there was a light wind, and he, witness, told them to hoist sails and make exertions to get out, but they made none—that of the vessels which were left, and which

34      v.8

he found in the track on his return up·it, one was *Captain Traverse's* vessel, which was the hindmost vessel, and which got out safely.

The defendants then further proved by *James Taylor*, a competent witness on their behalf, that he was in the *Maryland* on the night spoken of, when the *Hunter* and *Independence* were left in the track, and when the *Maryland* met said vessels on its return up the track; that he heard *Captain Taylor*, of the *Maryland*, offer to *Jones* to bring said vessels back to *Baltimore*, which offer was refused; that it was his impression, that if the said vessels had then made exertions they might have made their way out—that the *Maryland* lay that night in the track, about three hundred yards above said vessels, and that during that night, the witness did not see any exertions made by their respective crews to get them out. The said witness also stated, on cross examination, that in his opinion the *Maryland* could have carried said vessels out that night—that he saw the witness, *Captain Taylor*, in conversation with *Jones*, but did not hear the whole—that he heard the offer of *Taylor*, to bring the vessels back to *Baltimore*, but does not recollect hearing any thing said about the return of the *Independence*.

The defendants further proved by ——— *Gray*, a competent witness on their behalf, that he was on board the *Maryland* on the occasion spoken of by the other witnesses, when the *Hunter* and *Independence* were taken in tow, to be towed out of the port of *Baltimore*—that he heard *Captain Taylor*, of the *Maryland*, when they stopped at *Hawkins' Point*, give the vessels notice, and these among others, to make their fasts secure, and that it must be at their risk, for if they broke loose, it would be impossible for him to turn back for them. That on the return of the *Maryland* up the track, these vessels, the *Hunter* and *Independence*, with three others, were discovered to have been left in it. That *Taylor* then offered to bring the *Hunter* and *Independence* back to *Baltimore*, but refused to turn back and take them out of the ice, and that the *Maryland* then had in tow a boat which she

had brought from below, and near the edge of the ice. That *Taylor's* offer to bring the vessels back to *Baltimore* was declined, and that whilst near them, *Taylor* supplied one of the said vessels, at the request of its captain, with some provisions. That before the *Maryland* left said vessels on her way up, *Jones*, the witness, with a blind man, came on board, whom witness found in the cabin of the *Maryland*, when he went to supper. That witness then heard *Jones* express high satisfaction at getting on board the *Maryland*, and that *Jones* then remarked that the crew of the boat he was in, were not trustworthy—that he could not get them out of the cabin to do any work—that he could not trust himself with them—that they were mostly lazy blacks, and that he believed said crew could have taken the boat out, if they had made proper exertions.

The defendants then offered to prove by —— *Norris*, a competent witness on their behalf, that the enterprise or attempt to tow out vessels, in the progress of which the *Hunter* and *Independence* were left in the ice, as stated by the witnesses in this cause, originated with witness, who had several vessels detained by the ice in the harbour of *Baltimore*. That in consequence of the severity of the weather, the harbour had been for a long time closed, to the great injury of the commerce of the *city of Baltimore*, and that witness applied to *Meeteer*, the president of the company, defendants, and offered three hundred dollars to them if they would tow his vessels out. That said president expressed much reluctance at first to make the attempt, but finally agreed if a number of vessels offered to be towed out, sufficient to defray the probable cost of the enterprise. That a sufficient number was procured, the vessels paying according to tonnage, and including witness' three vessels, for which he paid three hundred dollars. That when the said president agreed to undertake the enterprise, it was distinctly understood by the witness, that the company were to be at no risk, and were not to be paid any thing if they did not succeed in the enterprise. That such was the nature of the witness' contract

with them, as far as witness understood the nature of the arrangements into which the said president agreed to enter, when at witness' instance they agreed to make the attempt.

To the admission of which evidence, the plaintiff, by his counsel, objected, but the defendants, by their counsel, insisted that it was admissible generally, under the issue in this cause, and that if not admissible generally, it was admissible for the purpose of sustaining the statements made by the witness, *Taylor*, as to the conversation proved by him, to have been held between the witness, *Jones*; and the said *Meeteer*, and also, as evidence from which, in deciding between the contradictory statements of *Taylor* and *Jones*, the jury might be enabled. to determine with whom *Jones* in fact made his contract, and what that contract really was. But the court (*Archer*, *Ch. J.*) were. of opinion, and so decided, that the said evidence was not admissible, either generally, or for any of said purposes, and accordingly rejected all of said testimony. The defendants excepted.

4TH EXCEPTION.—After the evidence stated in defendants' preceding bill of exception had been offered or given, the defendants further proved by ——— *McCulloch*, the facts proved by *James Taylor* and *Gray* in the third exception, and then further proved by *Captain Trippe*, a competent witness on their behalf, that he was captain of the steamboat *Independence* on the occasion spoken of by the witnesses, when the *Hunter* and the *Independence* were taken in tow. That his boat went ahead to break the ice, and after getting through the ice, went on to *Annapolis* with a boat in tow, which it had taken in tow at *Hawkins' Point*, reached *Annapolis* between ten and eleven o'clock that night, and on the next day, (*Friday*,) got the *Pacific* in tow, a vessel which, by the original arrangement, was to be towed up, if they succeeded in getting through the ice ; and that the agreement to tow this vessel, in that event, had been made before the arrangements to tow the vessels out from *Baltimore* was completed—and before the contract proved by *Jones*. That on his return to *Baltimore* with the *Pacific* in tow, he got to the edge of the ice about or near dark, on *Friday* night, and

got the other vessels there waiting to be towed, in readiness, and set out on his return up the track—that in the track met with several vessels, whose crew, or some of them, stated that they had been left on the voyage down, and requested witness to take them out of the ice—that witness refused to turn back and take them out, as he did not deem it prudent for many reasons—that no request was made to him by any of them, to bring them or their vessels back, which he could and would have done with great cheerfulness. That amongst the vessels he so met in the track, were three lying together, by which or some of which the application to take them out was refused by him, but none of them desired him to take them back to *Baltimore.* Witness also stated, that the enterprise was undertaken at the instance of, and to gratify the wishes of the mercantile community of *Baltimore,* whose commerce was suffering from the harbour having been so long closed by ice—that it was considered questionable whether the attempt would prove successful, and that the compensation received did not pay the expenses and damages sustained in the accomplishment of it. That after witness' boat passed the said vessels on the track, it went on until it met the *Maryland* in the ice near the *Fort,* much injured, and wanting his assistance to get to *Baltimore,* which, with his aid, it reached on *Saturday* morning. That the *Maryland* was not sheathed behind, nor armed with axes to cut the ice, or otherwise equipped for that purpose, as his boat was, and that from the condition in which he found the *Maryland,* he does not think it would have been prudent for *Taylor,* with a due regard to the safety of his boat and crew, when he met the *Independence* and the *Hunter* in the track, to have turned back and towed them out of the ice, and that the attempt, if practicable, would have been attended with great risk. That said witness also stated, on cross examination, that his boat might have taken said vessels out when it was on the return, but he did not think it prudent, from a regard to the vessels which he had in tow—that on his return the track was closed, having been frozen the night previous. That he thinks it

**270** CASES IN THE COURT OF APPEALS

The Penn. Del. and Md. Steam Navigation Co. *vs.* Dandridge.—1836.

from two to two and a half miles from the edge of the ice to the place at which these vessels were lying, and that if his boat had had no vessels in tow, he might have taken them out. That he believes that he did not complain of *Taylor's* refusal to take them out, when informed of it by them, as it was the arrangement between him and *Taylor*, that *Taylor* should take the vessels out which were to be towed down. That on his return, he passed these vessels about seven or eight o'clock, on *Friday* evening, and the weather had then become moderate, and that in his opinion, if these vessels had then made exertion, as the track had been opened by his boat, that they could have got out safely, and that he did not see them make any exertions. That he did say something to them about going down next morning to take them out, but next morning the weather changed, the ice broke up, and it become unnecessary. That when he passed said vessels, they were lying in the ice in safety, and thinks they would not have been injured by driving against the ice, as they were lying alongside of it, and not at any distance from it, and that the vessel might then chafe a little, but would not cut through in twelve or fifteen hours, as the wind, in such a situation, would have no hold on the vessel. That the vessels towed out, paid by the ton, the highest charge for any one being one hundred and fifty dollars, and the whole amount about eight hundred dollars—that from none of the vessels he met, was there any apprehension of danger expressed to him, and that on *Friday* evening, after his boat broke the track, they could have got out with proper exertions.

The defendants after offering proof in corroboration of *Captain Trippe's* evidence, further proved by *Isaac Wilson*, a competent witness on their behalf, that he was the clerk on board the steamboat *Independence*, on the occasion referred to by the other witnesses, and that when the vessels stopped at *Hawkins' Point*, he went to several vessels, for taking which out, the money was not to be paid in *Baltimore*, to collect sums to be paid by them respectively, for taking them through the ice—that his instructions were given to him by *Mr. Mc-*

*Elderry*, and were that he should not collect the money until they got out, or nearly out of the ice, but to collect it before they actually got out, so that they might not slip away, and avoid paying altogether, and if they did not get out, the money was not to be paid—that he received from the witness, *Jones*, the money to be paid for towing the said vessels, the *Independence* and the *Hunter*, and that some objection was then made by *Gundry*, to paying before they got out, and that witness believes that he did then say there was no doubt then about their getting out, if they made their fasts secure. That whilst at *Hawkins' Point*, *Captain Taylor* went several times along the line of vessels, and charged them to make their fasts secure. That witness returned in the *Independence*, and met several vessels in the track, and heard no application from any of them to bring them back to *Baltimore*. That he did not offer to return to any of the vessels left in the track, the money collected from them, nor did they ask for a return of it.

The defendants also proved by ——— *Bradshaw*, a competent witness on their behalf, that he was present some time in the spring of 1832, and heard a conversation between *Captain Taylor* and *Captain Gundry*, two of the witnesses, in which *Gundry* stated to *Taylor* that they stripped the said schooner *Hunter*, of her sails, and took some articles out of her, before the storm of *Saturday* morning came on—and that they thought then she was in a sinking condition—and said witness then stated to the jury, that in his opinion, if the *Hunter* was in a sinking condition, as *Gundry* then stated, she would have sunk before she went to the *Kent* shore, where she, in fact, went ashore.

The defendants also proved by *Captain Taylor*, who was re-examined for that purpose, that *Captain Gundry* held with him, *Taylor*, the conversation above stated, by the witness, *Bradshaw*—that on *Thursday* night when the witness, *Jones*, came on board the *Maryland* from his boat in the track, as before stated, *Jones* remarked to him, that the owners of the boat ought to return him his money, as they had not taken

his vessels out, and that witness then replied to him, *Jones*, that he had no doubt that they would, if he would call on them and ask for it.

The plaintiff in reply to the defendants' testimony, then offered in evidence the deposition of *Traverse* and *Carew*, taken by consent of parties.

These depositions related to the course pursued in taking the vessels out—the difficulties encountered in the ice—the nature and extent of the storm in which the *Hunter* was lost; the refusal and ability of the *Maryland* to take the *Hunter* out before the storm—and the fact that *McElderry* had made other contracts for towing out than for these vessels—and also contained collateral matters contradictory of some portions of the defendants' proof, and proof sustaining the veracity of *D. Jones*.

After all the testimony stated in this bill of exceptions, and the defendants' preceding bills of exceptions (which testimony is all to be regarded as forming a part of this bill of exceptions,) had been offered, the defendants, by their counsel, prayed the court to direct the jury as follows, upon the whole evidence in this cause:

1. That the general object and design of the defendants' charter being to transport passengers and merchandise from *Baltimore* to *Philadelphia*, and *Mr. McElderry* being their agent, that unless otherwise proven, his agency is limited to the business of the company, connected with or relating to such object and design.

2. That the charter granted to the defendants, limits them to the pursuit of particular objects specified in that charter, and that the breaking of ice, and towing vessels through the track thus broken, such vessels being destined for *Virginia*, is not one of those objects about which they could empower their agent to contract, and for which he could contract for them, at all events not without a special power conferred for that purpose, or a subsequent ratification by the company, of such contract.

3. That the evidence offered by the plaintiff, relative to

the loss of, or injury to his goods on board the schooner *Hunter*, is inadmissible under the declaration in this action for the purpose of establishing for him any claim to damage against the defendants, for such loss or injury.

4. That if the evidence mentioned in the defendants' third prayer be admitted, for the purpose therein mentioned, there is a fatal variance between the causes and manner of the loss of, or injury to, the plaintiff's said goods, as alleged in the plaintiff's declaration in this cause, and the causes and manner of such loss or injury offered in evidence, and the plaintiff is therefore, not entitled to recover therefor under said declaration.

5. If the jury find from the evidence that there was any contract between the parties to this action, or their agents, relative to towing or taking the schooner *Hunter* through the ice from the port of *Baltimore*, yet if they further find that such contract related solely to the taking of said vessel, and not to the transportation of any goods of the plaintiff, on board said vessel, and that there was no agreement between said parties, or their agents, relative to the transportation of any such goods of the plaintiff, then the plaintiff is not entitled to recover in this action for any loss of, or injury to, any goods of his on board said vessel.

6. That if the jury find that the contract between the parties, on which this action is founded, was as is stated in the next preceding, the defendants' fifth prayer, then there is a variance between the contract as alleged in the plaintiff's declaration in this cause, and the contract proved, and the plaintiff is therefore not entitled to recover.

7. That if the jury believe from the evidence, that there was no express agreement on the part of the defendants with the plaintiff, or his agent, to take the said schooner *Hunter* through the ice in safety, and to be responsible to the plaintiff for all losses or injuries which might arise if the said vessel was not carried through in safety, and that the agents of the defendants, in towing or taking said vessel through the ice, used all proper and reasonable care and diligence, and

such as any prudent man under the circumstances could or would have used in the endeavour to take said vessel through the ice, and that said vessel was detached from the line of vessels towed out, and left in the track along which they were towed, by misadventure, and not from the want of any reasonable care or diligence on the part of said agents; and if the jury further believe, that the said agents, upon their return up the said track, finding the said vessel therein, offered to take her back to *Baltimore*, which was declined, and that in the refusal of said agents to return in the track with said vessel, and in the direction from *Baltimore*, and take her out of the ice in that direction, they, the said agents, did what any prudent master of a steamboat, and having a due regard for the safety of his vessel and crew, under the circumstances would have done, then the plaintiff is not entitled to recover.

8. That if the jury believe from the evidence, that in the endeavour of the defendants' agents to tow or take through the ice from the port of *Baltimore*, the line of vessels with which the said vessel, the *Hunter*, was connected, the *Hunter* was detached from said line and left in or near the track along which said vessels were towed, and that upon the return of the defendants' said agents, up the said track, to the port of *Baltimore*, they offered to take the said vessel, the *Hunter* and her cargo, back to *Baltimore*, and could and would have done so, without injury to the cargo, but that the agents of, or servants of the plaintiff, having the management of the *Hunter*, neglected or refused to embrace said offer, and the plaintiff's goods on board said vessel were afterwards lost or damaged, then the plaintiff is not entitled to recover for any such loss or damage.

9. That if the jury believe from the evidence, that after the said schooner *Hunter*, and the plaintiff's schooner, the *Independence*, were detached from the line of vessels, which the defendants' agents were taking or towing out, and left together in the said track, the hands on board, if they had made due and proper exertions, and such as prudent and

faithful agents, under the circumstances, would have made, might have taken said vessels and their cargoes in safety through the ice, and that said hands omitted or refused to make such exertions, and the plaintiff's goods were afterwards lost or damaged, then the plaintiff is not entitled to recover for any such loss or damage.

10. That if the jury believe that the defendants did not contract to carry the schooner *Hunter* out of the ice, and out of the harbour of *Baltimore*, to a point of safety in the river or bay below, where the same was frozen, or the navigation was obstructed by ice, by breaking the ice and towing said schooner to such place of safety—that then the engagement of the defendants was merely a contingent engagement, then the plaintiff cannot recover on this nar.

11. That if the jury believe that the schooner *Hunter* could have returned to *Baltimore* with the *Maryland*, or the *Independence*, and that she neglected to do so, and that a loss happened in consequence of this neglect on the part of the master and crew, that the company are not responsible for such loss.

12. If the jury shall believe that a master and crew of ordinary diligence, could, by the exercise of ordinary skill and prudence, have prevented the loss of the schooner *Hunter*, and that they neglected to use such ordinary skill and prudence, and by the neglect thereof, the goods of the plaintiff were lost, that the defendants are not liable for such loss, nor for any damages, except nominal damages.

13. That if the jury believe from the evidence, that the agents of the defendants, in towing or taking the schooner *Hunter* through the ice, from the port of *Baltimore*, used all proper and reasonable care and diligence, and such as any prudent master of a vessel or steamboat, under the circumstances could have used, in the endeavour to take said vessel, the *Hunter*, through the ice, and that said vessel, the *Hunter*, was already detached from the line of vessels towed out and left in the track, along which they were towed by misadventure; and not for the want of any reasonable care or

diligence on the part of said agents, and without the knowledge of said agents, and that, upon the return of said agents up the said track, they offered to take the said vessel, the *Hunter*, and her cargo back to *Baltimore*, and could and would have done so without injury to the said vessel and cargo, but that the agents or servants of the plaintiff having the management of the *Hunter*, and being aware of the danger of their situation, neglected or refused to embrace said offer, and the plaintiff's goods on board said vessel, were afterwards lost or damaged, then the plaintiff is not entitled to recover for any such loss or damage.

14. That if the jury believe from the evidence, that said vessel was detached from the line of vessels towed out, and left in the track in the manner stated in the next preceding, the defendants' thirteenth prayer, and that there was no express agreement on the part of the defendants with the plaintiff, or his agent, to take the said schooner *Hunter* through the ice in safety, and to be responsible to the plaintiff for any losses or injuries which might arise if said vessel was not carried through in safety; and that the agents of the defendants, in towing or taking said vessel through the ice, used all proper and reasonable care and diligence, and such as any prudent man under the circumstances could or would have used, in the endeavour to take said vessel through the ice, and that said vessel was detached from the line of vessels towed out and left in the track along which they were towed by misadventure, and not from the want of any reasonable care or diligence on the part of said agents— and if the jury further believe that said agents, upon their return up the said track, finding said vessel therein, offered to take her back to *Baltimore*, which was declined, and that in the refusal of said agents to return in the track with said vessel, in the direction from *Baltimore*, and take her out of the ice in that direction; they, the said agents, did what any prudent master of a steamboat, and having a due regard to the safety of his vessel and crew, under the circumstances, would have done, then the plaintiff is not entitled to recover.

15. That if the jury believe from the evidence, that the agents of the defendants, in towing or taking the schooner *Hunter* through the ice, from the port of *Baltimore*, used all proper and reasonable care and diligence, and such as any prudent master of a vessel or steamboat, under the circumstances could have used, in the endeavour to take said vessel, the *Hunter*, through the ice, and that said vessel, the *Hunter*, was detached from the line of vessels towed out and left in the track along which they were towed, by misadventure, and not for the want of any reasonable care or diligence on the part of said agent, and without the knowledge of said agents, and that upon the return of said agents up the said track, they offered to take said vessel, the *Hunter*, and her cargo back to *Baltimore*, and could and would have done so, without injury to said vessel and cargo, but that the agents or servants of said plaintiff having the management of said vessel and cargo, and aware of the danger of their situation, neglected or refused to embrace such offer, and if the jury further find, that the master of the steamboat, upon reaching said vessel, refused to take her back out of the ice, and that in such refusal, the master did what any prudent master of a steamboat, under the circumstances, and having a due regard to the safety of the vessel under his charge, would have done, then the plaintiff is not entitled to recover for the loss of his cargo on board said schooner *Hunter*.

16. That there is a fatal variance between the causes and manner of the injury of, or loss to the goods of the plaintiff on board the schooner *Hunter*, and the causes and manner of their injury or loss, as offered in evidence, because the proof is that the said goods were not lost or injured, merely by the refusal or neglect of the defendants to carry the said goods safely, agreeably to the contract alleged by the plaintiff, but by the defendants' agents having commenced the performance of the contract, and after taking the said schooner *Hunter* in tow, having left her in the ice, exposed to the action of the wind and weather, whereby she was lost, and also because the proof shows that the said goods were not lost merely by

the non-performance or mis-performance of the defendants' alleged contract, but by the defendants having left the vessel in the ice, where being left, a storm came up, by which, as the proximate cause, the loss of the said goods was occasioned.

17. That if the jury believe that the vessel or vessels which the *Maryland* had in tow, on her return up the track to *Baltimore*, or any of them, and the vessel or vessels which the *Independence* had in tow, on her return up the track to *Baltimore*, or any of them, and which said boats, the *Maryland* and *Independence* had in tow when they met the *Hunter*, were vessels which the defendants, or their agents, were under contract to tow up to *Baltimore*, on their return from towing down the line of vessels with which the *Hunter* was connected, and that *Dr. Jones*, the agent of the plaintiff, knew that the defendants, or their agents, were under contract to tow such vessel or vessels up the said track upon said return, at the time when *Dr. Jones* made the contract with *Mr. McElderry*, offered in evidence, that then it was an excuse to the defendants or their agents, for not returning immediately, and going out of the ice with the *Hunter*, and leaving the vessel or vessels which the said agents were bringing up the track, that the defendants, or their said agents, were under such contract to bring up the latter vessel or vessels.

18. That if the jury believe from the evidence, that *Mr. McElderry*, with whom the contract offered in evidence by the plaintiff was made, was the general and ordinary agent of the defendants, yet if they also believe that the duties of *Mr. McElderry*, as such agent, extended only to making contracts for the carriage or transportation of passengers or merchandise between *Baltimore* and *Philadelphia*, or to or from any intermediate points in the line of the transportation between said termini—and if they also believe, that the contract offered in evidence, for the employment of the boats of the defendants, in towing the *Hunter* out of the ice, was one which was entered into solely for the purpose of towing out vessels going to *Virginia*, or down the *Chesapeake bay*, that

such contract had no relation to and was not a part of the business of the defendants in establishing and conducting a line of steamboats, or other vessels, stages or other carriages between *Philadelphia* and *Baltimore*, for the conveyance of passengers and the transportation of merchandise and other articles, then the said *McElderry* was not authorized to make said contract for and on behalf of the defendants, or at least that he was not authorized to make it, and the plaintiff is not entitled to recover thereon against the defendants, unless the said *McElderry* had special authority from the defendants, or the president and directors of the *Pennsylvania, Delaware,* and *Maryland Steam Navigation Company,* to make such contract, or unless the said contract was subsequently adopted or sanctioned by the defendants or the said president and directors.

19. That if the jury believe that the contract between *McElderry,* as the agent of the defendants, and *Dr. Jones,* the agent of the plaintiff, of which the plaintiff has offered evidence, was in its nature, and as to its objects, such as is stated in the next preceding, the defendants' eighteenth prayer, then such contract was not within the scope of the chartered power of the defendants, which charter it is agreed is in evidence in this case, being the act of 1825, ch. 179, and the plaintiff is not entitled to recover thereon, even if the jury should believe that the said *McElderry* was authorized by the defendants to make the same, or that it was adopted or sanctioned by the defendants.

Of which aforegoing prayers of the defendants, the court granted the fifth, sixth, ninth, tenth, and twelfth of said prayers, but the remaining of said prayers of the defendants, and all and each of them, to wit: the first, second, third, fourth, seventh, eighth, eleventh, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, and nineteenth prayers, the court refused to grant, but gave to the jury the following opinions and instructions :

1. If the jury believe the contract to be as proved by *Dr. Jones,* that *Jones* was the agent of the plaintiff, and *McEl-*

*derry* of defendants, and that the defendants, although they commenced towing out the *Hunter*, yet by the giving way of the fastenings of the vessels, the *Hunter* was thrown loose, and left behind in the ice, and that being so thrown loose, was not attributable to the vessels entered by *Dr. Jones*, and that all reasonable exertions were made by the *Hunter* to get out of the ice, and free from danger of ice, and that said exertions were ineffectual, and that the cargo of the *Hunter* was partially lost and damaged in consequence of the failure of the defendants to comply with their contract, and in consequence of being left in the ice, then the plaintiff would be entitled to recover in damages, to the extent of the injury he sustained in his goods.

2. But if the jury believe the above facts, and that reasonable exertions were not made by the *Hunter* to free herself from the ice, and that she might, by such exertions, have escaped danger, the plaintiff cannot recover for the loss or injury of his goods.

3. If the jury believe all the facts contained in the court's first direction, except that reasonable exertions were made by the *Hunter* to clear herself from the ice, which the jury should believe were not made, the plaintiff would in that event be entitled to nominal damages.

4. If the jury find from the evidence, that the contract to carry the *Hunter* and her cargo out of the ice, as proved by *Dr. Jones*, was made by the defendants' authorized agent, *Mr. McElderry*, with *Dr. Jones*, as the authorized agent of the plaintiff, and if they also find that the *Hunter* and her cargo were lost in consequence of being left in the ice by the defendants' agents, on *Thursday* night, and being driven ashore as is given in evidence by plaintiff; and if they also find that the defendants or either of their agents, the steamboat *Independence* or *Maryland*, could have carried them out of the ice before the storm began or said loss occurred, by reasonable exertions, that then the plaintiff is entitled to recover, and that it is no excuse to defendants for not taking the *Hunter* out of said ice, that their said agents had, after

entering into said contract to carry her and her cargo out of the ice, entered into other contracts to bring other vessels to *Baltimore* from the *Chesapeake bay* or elsewhere, which they could not have complied with had they stopped to take the *Hunter* out of the ice, provided the jury believe that reasonable and proper exertions were made by the officers and crew of the *Hunter*, to extricate the vessel and cargo from danger from the ice, and provided the jury further believe that the loss proceeded from injuries inflicted by the ice while she was detained in the track, either in her efforts to get out of the danger, or from the storm driving the vessel against the ice, or by being left in the ice by the agents of defendants, from which she could not extricate herself.

5. If the jury believe the evidence of *Dr. Jones*, in relation to the contract for carrying out the *Hunter* and her cargo, and if they also believe that one of the said agents of the defendants, acting as such on board the steamboat *Independence*, when said boat was with the *Maryland*, and under said contract engaged in taking out said vessel and her cargo, and the rest of the vessels then towed out of the ice by said steamboats, including the other vessel of plaintiff, the schooner *Independence*, whilst lying at *Hawkins' Point* in the way down with said boats collected the money agreed to be paid by *Dr. Jones*, as agent of plaintiff, with *Mr. McElderry*, as agent of defendants, and afterwards paid over said money to defendants; and if they also believe that the defendants have ever since retained said money, as also, all the other money that was received by said *McElderry*, or the other agents of defendants, from the other vessels towed out of the ice at the same time by the two steamboats, the *Maryland* and the *Independence*, that then said facts are in law, an adoption of the contract under which said money was paid by plaintiff, and that said contract is as binding on defendants as if there was clear evidence of a precise authority from defendants to *McElderry*, to enter into said contract on their account. To which refusal of the court to grant said rejected prayers of the defendants, and to which refusal as to

36      v.8

each of them, and to the granting of which said opinions and directions by the court, and of each of them, the defendants excepted and appealed to this court.

The cause was argued before BUCHANAN, Ch. J. and DORSEY, CHAMBERS, and SPENCE, Judges.

### DEFENDANTS' CHARTER—Act of 1825, ch. 279.

SECTION 1. *Be it enacted*, That ———— and others, their associates, successors, and assigns, be, and they are hereby created and made a corporation and body politic, by the name, style, and title of *The Pennsylvania, Delaware, and Maryland Steam Navigation Company*, and by that name, style, and title, shall have perpetual succession, and shall be able and capable in law to sue and be sued, to plead and be impleaded, answer and be answered in any court of law or equity; to make, have, and use a common seal, and the same at pleasure, to change, alter, and renew; and generally to do all such acts as shall be proper and necessary *for the purpose of establishing and conducting a line or lines of steamboats, vessels, and stages, or other carriages, between Philadelphia and Baltimore, for the conveyance of passengers and transportation of merchandise and other articles.*

SEC. 8. *And be it enacted*, That the directors or a majority of them shall have full power to appoint and employ, and in their discretion to remove or dismiss a secretary, treasurer, and all such other officers, clerks, agents, mechanics, labourers, and servants, as they shall deem necessary from time to time, to attend to and transact or execute all the affairs and business of the company, and fix their compensation, to contract, agree for, and purchase, rent, or hire, all such lands, chattels, materials, rights, privileges, and effects whatever; and to make and repair or cause to be made and repaired all such *roads, wharves, boats, vessels, carriages, and other conveniences* as they shall deem necessary for effecting the objects of the company, and the same or any part thereof in their discretion to sell or otherwise dispose of; to call for monthly

or other instalments of the stock not exceeding ten dollars on each share per month, on at least two weeks' notice being given, to apply the said instalments when received, and all other funds of the company, so far as may be necessary to effect the objects aforesaid, and in payment of the necessary expenses of the company, and to pass all such resolutions and by-laws as may be necessary to carry into effect the powers vested in them by this charter, and the said resolutions and by-laws, to alter, repeal, annul, or renew—subject nevertheless to the revision and control of the stockholders in the manner hereinafter provided.

GLENN, for the appellants, contended :

1st. The first question in the case relates to the admissibility of the proof of the loss, and is presented by appellants' first exception. Under this exception the counsel for the appellants insists, that the testimony was inadmissible for the reasons there specially assigned, and also because the goods alleged to have been lost are not sufficiently described in the declaration to entitle the plaintiff to offer evidence of their loss, or recover their value in this action ; and that the court below erred in receiving the said testimony ; on this question he cited : 1 *Chit. Plea.* 371, 319. *Ib.* 440, 442. *Archb. on Plea.* 170, 171. 2 *Lord Ray.* 1007. *Ib.* 1401.

2d point.—This arises under the appellants' second exception, and relates to the admissibility of the testimony of *McElderry*, the agent of the defendants, with whom the contract, upon which the plaintiff sues, was in fact made—and under this exception the counsel for the appellants contends that *McElderry*, although a stockholder in the *Pennsylvania, Delaware, and Maryland Steam Navigation Company*, was yet competent as the *agent* of the defendants to prove for the defendants the contract made by him as such agent, and that the court below erred in rejecting his testimony. *City Bank vs. Bateman,* 7 *Har. and John.* 104, 109. *Union Bank vs. Ridgely,* 1 *Har. and Gill,* 408. *Pal. on Agen.* 279, 280. *Theobald Agen.* 318, 319.

*3d point.*—This arises under the third exception, and relates to the admissibility of the testimony of the witness *Norris.* , And the appellants' counsel will contend that said testimony was admissible for the purposes specially stated in their said exception, and also as a part of one and the same transaction or enterprise out of which grew the contract with the plaintiff, tending to illustrate the origin and objects of the whole enterprise, to show the responsibilities which the defendants intended to assume under their contracts connected with said enterprise, and to show the want of authority in the agent, *McElderry*, to make the contract on behalf of the defendants as proved by the witness, *Jones*, to be responsible for the hazards of the enterprise. For which reasons they will contend that the court below erred in rejecting this testimony.

*4th point.*—This is raised by the third and fourth prayers in appellants' fourth exception, and presents the same questions which are stated under appellants' first point, excepting that the fourth prayer conceding the testimony to be admissible, calls upon the court to say, that the proof offered of the causes and manner of the loss of the plaintiff's goods does not correspond with the causes and manner of the loss of the same as alleged in the plaintiff's declaration. And under this it will be contended, that the declaration limits the plaintiff to proof of a loss resulting directly from the defendants' refusal or neglect to perform their contract. That the allegation of nonfeasance does not entitle the plaintiff to offer proof of a misfeasance, and that there is a fatal variance between them, and that even if proof of misfeasance were admissible under the declaration, yet as the evidence when introduced shows that the loss did not result directly from such alleged misfeasance, but from the action of a storm as the proximate cause to which the vessel was exposed by the alleged failure of the defendants to perform their contract, the proof does not correspond with the declaration, and that for these reasons the court erred in rejecting said prayers.     1 *Chit. Plea.* 319. 3 *Stark. Ev.* 1557.     2 *Kent,* 443.     *Doane vs. Badger,* 12 *Mass.* 69.

*5th point.*—This is presented by the appellants' first, second, and eighteenth prayers in fourth exception, and relates to the authority of *McElderry* to bind the defendants by the contract sued upon. Under these it is contended, that *McElderry*, as general agent of the defendants, had no authority to bind them by said contract; that said contract had no relation, and was no part of the business entrusted to him under said general agency; that the contract was without the scope of the charter powers of said defendants, and therefore not within the scope of his general agency, and that therefore the court erred in rejecting these prayers. *Theobald on Agen.* 259, 302. 1825, *ch.* 279, *sects.* 1 *and* 8. *Wyman vs. Hallowell Bank,* 14 *Mass.* 58.

*6th point.*—This arises under the appellants' eighteenth and nineteenth prayers, and relates to the competency of the defendants under their charter to make the contract sued upon. Under these it will be contended, that said charter did not give the defendants authority to make the contract, and that they may defend themselves in this action under such want of authority, and are not estopped by the contract from alleging the want of power to make it. Under the charter, the company could not run to *Virginia,* nor interfere with other companies. Powers arising from express grant cannot be extended by implication. 2 *Kent,* 239–40, and cases there cited. When a corporation is authorized to act in a particular mode, this is a prohibition against acting in any other mode. *Broughton vs. Salwood Water Works,* 5 *Serg. and Low.* 216. *New York Firemen's Ins. Co. vs. Ely,* 2 *Cowen,* 699. *Jackson vs. Campbell,* 5 *Wend.* 572. A contract by a corporation does not estop her from calling it into question. This would seem to result from the necessity of acting through agents to whom no more power could be communicated than the charter authorized; the power of the company may be likened to the right of an individual to show a contract illegal, as against the provisions of the statute law or fraudulent; and the reason is stronger, as the other contracting party has the means of ascertaining the power of the

company by a reference to the charter.   *Clark vs. Mayor of Washington*, 12 *Wheat*. 40.

*7th point.*—This is presented by the fifth direction of the court, and relates to the court's opinion as to what amounted in law to an adoption by the defendants of the contract made by their agent, *McElderry*.   In opposition to this it will be contended, that the mere receipt of the money under the contract was not an adoption, unless the defendants or their agents received and retained it under a knowledge in fact of the contract actually made with *McElderry*, and that the said *McElderry* had transcended his authority in making it, or inserting stipulations in it on behalf of the defendants, incurring responsibilities for them, which he was not authorized to assume for them.   *Owings vs. Hull*, 9 *Peters*, 629. *Beall, et al vs. Cunningham*, 3 *Peters*, 69.

*8th point.*—This relates to the duties and responsibilities of the defendants or their agents under the contract in question.   Upon the *hypothesis* that it was not an express contract to carry the vessel through the ice in safety, and to be responsible for the hazards of the attempt to tow the vessel through the ice, and is raised by the appellants' thirteenth and fourteenth prayers, or rather by the fourteenth prayer, which embodies in itself the assumed facts of the thirteenth. The same question *is* raised but not so fully by the seventh prayer.

Under these prayers it will be contended, that the defendants, if such was the agreement, were responsible only for ordinary care and prudence in the performance of said contract, or at least only for the degree of care and prudence mentioned in the prayers, and that under the state of facts assumed in said prayers they were not answerable for the loss of the plaintiff's goods.   *Caton vs. Rumney*, 13 *Wend*. 389.

*9th point.*—This relates to the obligations of the contract, if even a contract to carry safely through the ice, and questions relative to it are presented by the appellants' thirteenth and fifteenth prayers.   The prayers themselves exhibit distinctly the propositions for which we shall contend.

*10th point.*—This relates to the defendants' excuse for not returning immediately with the *Hunter*, upon finding her in the track, in the fact that the defendants' vessels were engaged in towing other vessels up the track, under a previous contract known to the plaintiff. The prayer (seventeenth,) sufficiently states the propositions to be contended for.

*11th point.*—This arises under the motion in arrest of judgment, and the reasons are there sufficiently stated. 1 *Chitty Plea.* 321, 351, 353. 1 *Saun. P. and E.* 158. *Cooke vs. Simms*, 2 *Call.* 39. *Chandler and Hart vs. Rossiter*, 10 *Wend.* 487.

JOHN SCOTT, for the appellee, contended:

That the declaration was good in substance; corresponded with the contract proved, and that the motion in arrest came too late. He cited *McKinstry vs. Solomons*, 2 *John.* 57, 62. *Diblee vs. Best*, 11 *John.* 114, 117. 4 *John.* 237, 239. *Close vs. Miller*, 10 *John.* 94. He insisted that this was a case of nonfeasance, and not of misfeasance; that the object of pleading was to prevent surprise, and as the declaration covered all the goods on board the *Hunter*, more particularity was unnecessary and unreasonable. The case of *Boyle, et al vs. Lauglin*, in 4 *Har. and John.* 291, shows the responsibility of carriers, and is applicable to this case.

The fifth point on the fourth exception, including the first, and second, and eighteenth prayers of the defendants, rests upon the authority of *McElderry* to make the contract. After referring to the proof of his agency and the character of it, the counsel contended there was no difference of opinion as to the general rules regulating the conduct of general agents, but in this cause the agent had the authority to make the contract, or if not the defendants had adopted it. That adoption might be by parol—all the facts show the co-operation of the company in every part of the transaction. The use of their boat, hands and property, with the knowledge of the defendants engaged in this transaction. The business of the defendants was connected with commerce and navigation.

The mode of transportation was immaterial. It was along their line of travel, and there can be no difference between carrying the merchandise and towing the vessel which contained it.

Upon the sixth point he contended, that wherever there was an affinity between a charter and the practice under it, no harsh rules of construction were to be set up to deny the validity of the company's acts, and this principle answers the cases cited.

There is a distinction between a corporation endeavouring to enforce a contract, which it was not authorized to make, and being liable for a contract which it had improperly made. It is settled that they are liable for torts committed by their officers.

Upon the questions of the competency of the witnesses and admissibility of declarations under the second and third bills of exceptions, he cited, *Kemp vs. Baltimore Fire Ins. Co.* 2 *Gill and John.* 108. *City Bank vs. Bateman,* 7 *Har. and John.* 104, 109, 110. *Union Bank vs. Ridgely,* 1 *Har. and Gill,* 325, 408. 2 *Stark. Pr.* 4, 752. *Boyle, et al vs. Lauglin,* 4 *Har. and John.* 291.

R. JOHNSON, for the appellee, further contended :

It is important to consider the points on which this cause went to the jury—for though some prayers were rejected in form, they were granted in substance.

The objections to the declaration only arise upon the motion in arrest of judgment.

In the *first* exception the proof of the contract by *Jones,* is stated, not as offered, but as proved to the jury—part of the exception relates to proof given, part to proof offered to be given. The objection below was to the part offered as inadmissible. The proof of the contract was received without objection, and the objection actually made was to the proof of its violation.

The third prayer in the fourth exception relates to the breach under the pleadings, and assumes the existence of the contract.

The fourth prayer in the same exception also admits the contract, and insists upon a variance between the *breach* of the contract alleged and the *breach* as proved.

The first exception admits the contract, and the third and fourth prayers relate to the violation of it, admitting its existence, and yet they have been erroneously argued, as if they presented in this court the same questions.

Then the contract as proved by *Jones*, is in the cause, without objection, and *it was to carry in safety, through the ice, the Hunter and her cargo.*

The fifth, sixth, ninth, tenth, and twelfth prayers were granted.

The fifth prayer is confined to the vessel. The sixth prayer also supposes the contract relates only to the vessel.

Under the tenth prayer the jury were instructed, that if they did not find the contract as proved by *Jones*, the plaintiff could not recover.

I maintain that if the cause was put upon its true legal ground to the jury, this court will not reverse the judgment.

1. The cause was put upon the contract, if believed by the jury.

2. The plaintiff was bound to satisfy the jury by evidence, that the loss did not arise from the want of reasonable exertions to save the property on the part of his agents.

3. With reference to the proximate cause of the loss, the success of the cause depended upon the want of reasonable skill in defendants' agents, and although the plaintiff used all reasonable skill, the loss resulted from the ice.

4. The immediate cause of loss put to the jury was the failure of the defendants to comply with their contract.

That the steamboats could have taken the vessel out by reasonable skill, is the hypothesis upon which the cause went to the jury, and if this could not have been done before the storm, the verdict must have been for the defendants.

The *fifth* instruction informed the jury, that if *McElderry* was a general agent of the company, still they must find a subsequent ratification of the contract, which was equivalent

to an original grant of authority. The facts amount to a ratification, and are equivalent to an original express authority.

The argument then which places the cause upon the want of original authority to make the contract, and no ratification, must fail; for the question of ratification went to the jury who found it.

My object is still to show the actual points decided below. I call the attention of the court to the thirteenth, fourteenth, and fifteenth prayers.

The thirteenth prayer concedes that all reasonable efforts to take the schooner were necessary, and proposes that if the defendants' boats on their return to *Baltimore*, could have brought the *Hunter* back, and were prevented by the plaintiff, that this is an excuse. It in fact offers a violation of the contract as an excuse.

As to the fourteenth prayer, two grounds exist for sustaining the court's refusal to grant it.

1. The defendants considered it incumbent on the part of the jury to find an express and positive agreement on the part of the company to be responsible for the loss. It conceded *Jones'* proof of the contract, and that although the jury might find the defendants responsible in fact, still not liable.

2. The court granted it substantially by the tenth prayer and subsequent instruction.

The question of the contract, if embraced at all, is under the first and fourth prayers.

The first relates to the proof of the loss and want of description of the goods lost.

The fourth concedes the contract to be in evidence, and asks the court to decide upon its effect and the manner and proof of the loss.

It is evident so far as the first exception, and third and fourth prayers of fourth exception are involved, the contract as proved by *Jones*, was in evidence. The questions made were upon the breach, and the whole cause turned upon the fact of the finding of the contract, as proved by *Jones*.

The cause must be tested by the prayers actually granted

by the court. We are not to consider all the prayers made, but the granted prayers and the instructions objected to below.

The law of the cause is to be found in the fifth, sixth, ninth, tenth, and twelfth prayers and the court's fifth instruction; and if the law there found be the law of this cause, there can be no error for a misdirection.

Three classes of objections are relied on.

The *first* assumes that in proof, the plaintiff has established a cause of action, by making out a contract and breach, but objects to the right to recover, because the pleadings in the form of action adapted are not legally sufficient.

That class embraces points upon the first exception, and upon the third, fourth, and sixteenth prayers of the fourth exception.

The *second* class presents as a defence, that the making of the contract was a violation of the corporate power, which prevents the plaintiff from recovering against the corporation. It relies upon an asserted wrong to get rid of a contract for consideration.

This includes first, second, eighteenth, and nineteenth prayers under the fourth exception, and fifth and sixth points of the statement.

The *third* class presents objections on the merits; admitting a contract and relying upon its performance or a sufficient legal excuse for non-performance.

This embraces seventh, thirteenth, fourteenth, and fifteenth prayers of the fourth exception, making the eighth and ninth points of the statement and the seventeenth prayer, which constitutes the tenth point of the statement.

The *fourth* class of objections relate to the admissibility of the proof and the points which arise on the motion in arrest.

I propose to examine the second and third exceptions.

*McElderry* was a stockholder of the defendants' company. The general question involves the inquiry whether a stockholder in a private corporation can be a witness in its behalf. All that this court has decided in the three authorities cited,

is that a stockholder may be compelled to testify against a corporation. The general rule, 1 *Stark. Ev.* 105, 106, is that interest disqualifies a witness. The result of the case is, that if the judgment operates upon a fund in which the proffered witness has an interest, he is not competent. It does not depend on the extent of that operation. The law does not distinguish between that which will or will not operate on the witness himself, *Angel and Aimes*, 390. The exceptions relate to public corporations, in which the witness has no immediate personal interest. But the case of *Union Bank vs. Ridgely*, 1 *Har. and Gill*, 408, decides that the witness is only competent when within some settled exceptions. Then is this case an exception as argued on the other side? The fact to be disproved was the contract proved by *Jones*— and that the witness was the general agent of the defendants was the ground of the exception. If that constitutes an exception in this case, it constitutes an exception in all cases, consequently in the case of partners, and especially where *all* are not sued, and the one not sued is the person who made the contract, he becomes a witness *ex necessitate*. So of joint executors. Let it not be said, that in these cases the witness offered was contracting for himself, for such an exposition would let in legatees acting as agents for executors. The fallacy consists in a total misapprehension of the rule. The rule is that the evidence of the agent is let in in despite of the interest he has as mere agent; but as soon as the witness has any other interest, than that of agent, he is disqualified, and this construction covers all the cases. The exceptions must be established by *decided* cases. That in 1 *Har. and Gill*, 408, is an exception from necessity; for none but a corporator can have possession of the muniments of the corporation.

In the consideration of the third *exception*, it will be recollected that proof of the contract was admitted without objection. The arrangement referred to in *D. Jones'* evidence was mere inducement to the contract. He was ignorant of its particulars. *Taylor* proves that *Meeteer* declined making

any contract, and all that *Jones* proved was *his two vessels* were to be carried out. If the cause depended on *Taylor's* evidence then no contract was proved. *Taylor* had no interview with *McElderry*, nor was *Jones* advised that any contract had been made by which the company was to be responsible. Then as to the evidence offered through *Norris*, not one word relates to the contract proved by *Jones*, and admitted to the jury. Upon general principles the evidence of *Norris* was not admissible. *Boyle, et al vs. Lauglin*, 4 *Har. and John.* 291, 395. Each vessel had a separate contract made by his owner; one contract could reflect no light on the other unless it was brought home to the contracting parties. *Norris'* proof was not necessary to reconcile the proof of *Jones* and *Taylor*, for there was no contradiction between them, and we are not to suppose a contract for the purpose of admitting *Norris'* proof.

Under the first exception, and third, fourth, and sixteenth prayers, the objections relied on relate to a want of enumeration of the goods lost; and that the proximate cause of the loss, the storm, was not stated.

No distinction is taken between contracts verbal or in writing. It being a contract which could subsist verbally, the rules of pleading are the same. Then it results, that if a party in writing promises to carry a vessel and cargo, no nar is good which does not particularize the cargo. This is the objection relied on.

There are two great rules in pleading which provide :

1. That the defendant may not be taken by surprise by general pleading, letting in proof which he could not have anticipated.

2. That the judgment which may be pronounced upon a particular nar, may not enure to the benefit of the party in another action.

Now it is competent to declare generally for goods sold; though it is said not for goods destroyed. In an action on a policy for cargo, the particular cargo need not be described. In an action flowing from contract where the breach is a tort,

the goods it is said must be particularized.   Why this distinction ?   The judgment is conclusive upon all subsequent actions upon the same contract ; but as torts are several, and several may arise in the same transaction, hence the rule.   To gratify the rule of justice, the defendant here is entitled to such a statement as reasonably informs him what he is called upon to answer ; why then should a contract to carry a ship and cargo be more particularly stated than a policy on the same property ?   The proof *quoad* the cargo is the same in both cases.   The general designation is warranted by principle in both cases.   The defendant is entitled in both cases to such a description as would make the judgment conclusive upon his contract.   Under this contract there can be but one non-performance.   A recovery which alleges non-performance, forever puts this question to rest ; with reference to the breach the judgment must be conclusive.   The plaintiff cannot divide his contract so as to entitle himself to several suits.   There is this difference between contracts and torts.   Where the averment is descriptive of the contract, it is fatal not to establish it by proof ; not so as to torts.   Now if the rule is so, if obliged to describe the cargo here, a mistake in describing either what is or what is not on board, would be fatal.   In an action for freight the articles are not described.   The contract is to carry ; and the rules of pleading which guard against surprise and make the judgment conclusive, apply to this case.   The courts must not so construe these rules as to lead to practical inconvenience.   The rule contended for by the defendant will apply to mixed cargoes, and of any extent.   It leads to complexity.

But even in tort, a case like this, it would not be incumbent on the parties to use any other terms than the party has here adopted.   That which is agreed by stipulation to be the designation, shall be so throughout ; and it is not like the case of injury, independent of contract, for there the description is the only notice the defendant has.

The variance between the contract proved and alleged is not open on the record.

1. It is said the breach proved is misfeasance, and not non-feasance, as alleged.

2. That the proximate cause charged is not proved, while that which is proved is not admissible.

Upon the first objection I contend there can be but one non-performance ; and consequently every breach of misfeasance is non-performance. Under the contract every hour of continuance in the ice was an hour of non-performance. The contract being to take the schooner out of the ice ; the contract is not performed so long as she is in the ice.

Our opponents suppose that if the vessel was taken a short distance into the ice, that a failure as to residue is an act of misfeasance. Now such an objection relates merely to the degree or extent of performance, but it is still non-performance. If the plaintiff had declared for a misfeasance there would have been a variance.

The second part of this division refers to the statement of the loss in the *nar*, and proof refers to the sixteenth prayer, and is to be considered in connection with the court's fourth instruction. It obliges the jury to find, that the vessel and cargo were lost by being left in the ice by defendants—and that the ice caused the injury, either by *itself* or by detaining the vessel until the storm arose.

Now the contract was to carry the vessel out of the ice— all damages from ice, however acting, produces the same liability. Under the court's opinion the ice either directly or remotely must be the cause of the injury. If it be necessary to describe the cause of the loss, every part of it must be detailed. *Broughton vs. Salford Water Works*, 5 *Serg. and Low*, 216. If the object of the allegation is to give notice of the ground of loss, and a special mode of stating the loss is necessary, then no partial cause, operating to produce a loss, could be given in evidence unless pleaded. As to special damages, see 1 *Chitty*, 386. *Archb. Plea.* 170. The cases where special damages are required to be averred, are those where the damages are not the legal consequence of violations of the plaintiff's contract. Legal consequences are

not the subjects of pleading. Practically they are averred by the general allegation of tort in slander : but if you sue for a tort, not in itself actionable, special damage must be averred. The cause of action is the special damage. In other cases, if the thing charged legally tends to damage, no special damage need be alleged. Here we are suing on a contract; a violation of it gives as a legal consequence a right to damages, *per se* a cause of action. The extent of the damages sounds in evidence ; and all that was necessary to aver was a violation of the contract.

The first, second, eighteenth, and nineteenth prayers involved two questions.

1. Whether *McElderry* was authorized in fact to make a contract ; which admits the authority of the corporation so to employ him.

2. Was it an authority which the company had power to grant?

It is shown in proof that he was general agent, and authorized to contract with reference to the steamboats. A general agent to contract is authorized to enter into all contracts which his principal might make. The limitations of his power are *inter se*. If he acts as general agent and so holds himself out, his power is to be considered without limitation, so far as the world is concerned. He binds his principal without ratification. Then there is evidence to show a legal contract between plaintiff and defendants.

The fifth instruction actually given puts an end to this inquiry. The receipt of the money from the agent, who had received it *qua* agent, and retained by the principal is an adoption of the contract.

In what is the fifth instruction without proof? The fact of the collection of the money is proved by a clerk and agent of the defendants. Its non return to the plaintiff is proved by the absence of proof of a return. Then was the money paid over by the agent? It is immaterial whether the defendants actually received the money, or knowing it to be in the hands of one of their agents suffered it to remain there. Acquies-

cence in case like this, by the principal, is evidence of adoption. The authority to contract is conceded. It cannot be denied that some species of contract was entered into for the employment of their steamboats. *Taylor*, who denies that he contracted with the owners of the towed vessels, admits that he contracted with the defendants. A contract out of the usual course of their business; a contract to carry is conceded. Its terms and extent are in dispute.

The eighteenth prayer was properly over-ruled, unless it could be responded to yea or nay. It contained three distinct propositions. If either was wrong, the court was right in rejecting it. It must be considered with reference to the case made. It applies to the whole action, but in law does not cover it, as the jury might find other facts from the evidence consistent with it, and which still would be an answer to it. In this part of the case, the charter is out of consideration. The defence relied on is a private limitation of the power of the agent, and the plaintiff cannot be referred to that as engrafting a principle upon it, when he was ignorant of the fact.

Corporations may be guilty of a tort, and as they can only act by agents, they must be liable for torts committed by their agents. *Angel and Aimes*, 220. *Gray vs. Portland Bank*, 3 *Mass*. 364. Whether the tort was committed in the execution of one of the powers of the corporation is not material; for in such case the charter would not convey an authority to do wrong.

The doctrine contended for is, that a company who are common carriers within certain termini, may get clear of a responsibility of the same description, on the ground that they were not within their termini; although they received and retained payment for the carriage. The only cases proceeding upon such ground must be when the contract was repudiated, and not when the company hold on to its fruits. Whether the contract was to carry is not material on this question. The objection is, that it relates to a contract out of the limits of the charter. The ground of the decisions in

38     v.8

such cases must be that it would be unjust to visit upon innocent stockholders, the consequences of acts not within the scope of their charter ; and consequently not within the power of the company's agents. But still, I wish to see the cause which decides, that a corporation is not to be visited with the consequences of fraud and contrivance. The same rule must apply to corporations as to individuals. A stockholder would say that he looked to the charter and appointed his agent. He denies his contract, and this would be a fraud, if upon such contract he took the money of the other party. *Chesapeake and Ohio Canal Co. vs. Baltimore and Ohio Rail Road Co.* 4 *Gill and John.* 1. The entering into an unauthorized contract is no destruction of the franchise, and the consequence is, that the corporation would reap the benefit of both legal and illegal contracts. *Chester Glass Co. vs. Dewey,* 16 *Mass.* 94, 100, 102. The consequences of illegal contracts by corporations are not matters to be urged by the contracting parties, but they act against the legislature who created the grant, and have the power of punishment. Let us look at the mischief of the doctrines maintained by this company. The agent purchases wood to carry out this contract. Its object is not covered by the charter. The incidental contract must fall with the principal one. Suppose the company had received the consideration of the principal contract, void as is contended, would it have to fulfil the incidental contracts which enabled it to earn the money ? If the doctrine is sound, all the ancillary contracts are void. There can be no degrees as to want of power. Great and small, principal and ancillary contracts are all void, if any be void, for the want of power under the charter of the corporation party to a contract.

The motion in arrest of judgment rests on four grounds, all of which relate to the sufficiency of averments in setting forth the contract and describing the property injured. As to any defect or inaccuracy in assigning a breach this is aided after verdict. The court will then intend that a sufficient breach was proved. *Bartlett vs. Crozier,* 15 *John.* 250. A

failure in the description of the property is also aided after verdict.

Other objections insist upon a failure of consideration, or of averments to show a consideration paid. We are to look at the contract set forth. Is it void for want of consideration? This does not relate to the form of the averment. If it was a promise binding on the part of the defendants, the corresponding stipulation on the part of the plaintiff being complied with, no doubt of its validity—as far as this question is concerned, it is immaterial what form of averment shows the acceptance of the defendants' part of the contract. The plaintiff's vessel is embayed by ice—the defendants know it—they say, pay us a certain sum and we will take her out—and the plaintiff requested them to take her. Now what is this but an engagement to pay the money? If upon performance of the work the plaintiff was bound to pay, and the plaintiff accepted the contract, this makes it a binding contract. The plaintiff could not set up a want of consideration. It is a case of promise for promise. The nar shows a consideration "to be paid by the plaintiff." This is a promise to pay by the plaintiff. It is the consideration money to the defendants. And taking the two allegations together, it constitutes an undertaking on the part of the plaintiff to pay the consideration. The objections yield a sufficient consideration, but insist upon a condition precedent, and that it should appear that it was performed or offered to be performed. But this is not a condition precedent; so far from it that only performance by defendants entitled them to the money. Averment of tender was therefore unnecessary. An offer to pay was also unnecessary, for the defendants refused to proceed with the contract. *Allegre vs. Maryland Ins. Co.* 6 *Har. and John.* 408. That the variance must be taken advantage of at the trial. *Pike vs. Evans,* 15 *John.* 210. That the averment of the consideration here was no condition precedent. *Barruso vs. Madan,* 2 *John.* 149. Not error if the jury was substantially instructed correctly. *Bosley vs. Chesapeake Ins. Co.* 3 *Gill and John.* 450, 472, and

that it is not the duty of the court to do more than respond yea or nay to a prayer. *Maryland Ins. Co. vs. Bathurst,* 5 *Gill and John.* 225.

McMAHON in reply, for the appellants.

There are preliminary considerations in this case appearing from the proof, which shew the justice of this appeal. The origin and nature of the enterprise and the motives which led to it. It was for the benefit of commerce and did not pay any profit to the company, nor was it to be at any risk. The attempt to carry the vessels out was considered hazardous and of doubtful success. No compensation was to be paid if not successful. In its outset and in all its characteristics it was a public spirited enterprise; but they did not become insurers for its success or safety. The agents of the plaintiff entered into this contract with full knowledge, that the company did not mean to become insurers. With this knowledge the plaintiff's agent contracted with the defendants' agent, and in opposition to notice from the president of the company. In his uni-lateral contract, the plaintiff objected to paying until he got clear of the ice or upon the assurance that all danger was past. The company upon his construction would have to pay the loss without any premium. As regards the claim for consequential injuries, the loss flowed from a refusal to adopt the means of escape after being awakened to a sense of danger; it is attributable to their own obstinacy. And in such a case the plaintiff objects to the company proving by the only means in their power, the agent who made the contract, the true nature of that contract. With these remarks I proceed to the first exception, and this objects to the admissibility of the evidence of *Jones, Gundry,* and *Treacle,* under the pleadings in this action. The declaration relies upon an undertaking to carry the *Hunter* out of port. There is no averment that the company had taken possession of the schooner for the purposes of the contract. It stands upon a simple contract of bailment, unaccompanied with a delivery. Delivery to

the bailee is not averred, and therefore could not be proved. The contract is proved, but proof of delivery to or conduct of the bailee is material, but neither is averred. Our objection is not to the assignment of the contract nor the breach of it, but to the insufficiency of the assignment of the damages sustained. The damage itself is not sufficiently assigned. The cause of damage is not sufficiently assigned or it is mis-alleged. This objection was made at the very first period it was competent to make it. There was no laying by; but it is taken at the threshold. As authorities to illustrate the distinction between general and special damages in pleading and proof, 1 *Chitty Plea.* 370, 440, 442, 443. 1 *Saun. P. and E.* 165. *Arch. Civ. Plea.* 170. 1 *Chitty Con.* 340, 345. Special damages are independent of contract, beyond the contract, and arise from contingent causes; the storm is such a cause. It may or may not arise. Those damages are contingent, which the law does not imply. Their existence must be shown. These effects must be proved, and liability for them must be averred. The books say it must be specially averred; its circumstances set forth, that the opposite party may be prepared to meet them. General damage is not traversable, but special damage is. The elements of special damage include, first, the action of the cause— second, that the cause produced the loss, and third, the responsibility of the defendants for it; as to how far it must be alleged, see 2 *Chitty Plea.* (edition of 1833,) 272, 317, 362, 367, 672, 675, 682. When a fact is to be stated it must be stated to a certain intent in general. But here the general rules of pleading are rebuked, and in this nar the plaintiff has not described any mode of damage, while the object is to recover for an injury or damage to goods. The general rule is that the goods injured or damaged must be stated. This rule applies as well to contracts as to torts, and the rule is stronger with reference to contracts. For then it is an act of commission in which the wrong-doer is aware of his misconduct.

In all torts direct or consequential, particularity is neces-

sary in the description of goods injured, and in a general way the kind of goods must be described. 1 *Chitty Plea.* 410, 411. *The People vs. Dunlop*, 13 *John.* 440. 1 *Lord Ray*, 1007. *Ib.* 1410. In all cases of contract and in actions for direct or consequential injuries to goods, the rule of pleading is the same. 2 *Chit. Plea.* 333, 356, 342, 669, (*g.*) *Step. Plea.* 340. 1 *Saun. P. and E.* 400. *Franklin Ins. Co. vs. Jenkins*, 3 *Wend.* 135. All these are cases of assumpsit, against carriers, to whom goods have been entrusted. The case of 3 *Wendall* is stronger than the one at bar, for defendants had not possession of the goods at the time of the injury.

The action of *indebetatus assumpsit* is an exception to the rule. There the goods are delivered, the action proceeds on an executed consideration, and is not for the goods which are stated by way of inducement, but for the money. We have nothing to do with the hardship of the rule. If it exists the court will apply it. But there is no hardship in this particularity and there may be as many actions for consequential injuries as there are separate causes thereof.

The cause of damage is not sufficiently alleged or misalleged. Whereby and by reason is not a statement of the cause. Whereby refers to the previous allegation, and by reason of negligence, &c. does no more. To recover for any result from negligence it must be stated, 1 *Saund. P, and E.* 166. In cases of bailment, there is an averment of delivery of goods to bailee, and by reason of improper conduct or negligence in and about the management of the property bailed the damage occurred. But here the breach is an allegation of total non-performance. Under such an allegation a partial breach may be proved, which is not attempted here. The breach of the contract is here relied on as a cause of independent consequential injury.

There is an essential distinction between misfeasance and nonfeasance. So if these defendants without reward agreed to carry the vessel out and then refused to take her, or without reward take her and leave her in the stream; the first case would not be the ground of an action, but the last on

the ground of a part of execution of the agreement, and then improperly abandoning the residue would furnish a right of action; but for misfeasance there is a different form of declaring from nonfeasance. 2 *Chitty*, 329, 330, 331.

In this case neither non-performance nor misfeasance caused the loss—but the storm, which is not alleged. This is an independent cause for which damages are claimed, though not averred, and here such a loss cannot be proved. When there is a contingent independent cause of loss you must allege and prove it. 1 *Stark.* 366. 3 *Stark.* 1584. Where there is a wrongful act, and a loss thereby arises from an intermediate cause, the intermediate cause must be alleged. *Fitzsimmons vs. Inglis*, 1 *Serg. and Low.* 181, 182. 2 *Chit. Pl.* 682, 656.

The object of this action is to recover damages, and the pleadings are silent as to how it occurred. Whether during the detention, caused by non-performance, the vessel was robbed, or injured by collision, or stranded, seems to have been considered immaterial, and that any species of evidence could be offered.

As against common carriers who have possession, a general form of declaring is allowed, but delay is averred and the carrier is called upon to account for it. If sufficient it serves him as defensive matter. His contract is to carry safely, he takes all perils with certain enumerated exceptions, and must show the cause of loss. This description of causes furnishes no analogy here.

These objections are not obviated by the fourth instruction of the court given to the jury after the evidence was admitted.

The second exception relates to the refusal of the county court to receive *McElderry's* evidence. We insist upon its admissibility. He was not a party to the suit and only incompetent on the ground of interest. *City Bank vs. Bateman*, 7 *Har. and John.* 107. In the matter of *Kep.* 1 *Paige*, 614. *Kemp vs. Baltimore Fire Ins. Co.* 2 *Gill and John.* 108. *Paley on Ev.* 318. The exception to the rule is that interested agents are admissible. It is a conflict between

general rules. All agents are competent witnesses. All interested persons are incompetent. An agent who has an interest in a verdict and in swelling its amount is competent under the case in 1 *Hen. Black.* The same interest which will not exclude a witness in the case of an individual, will not exclude him when agent of a corporation. Many charters compel the use of interested agents as stockholders. Hence the rule is stronger in favour of a corporation, for they are equally entitled to protection. There is no difference between an interest arising previous to the contract, or made so by the contract itself, and yet it is said that the remote interest of an agent in the possible loss of a contract would disqualify him. One made agent by the command of the law, adopted as agent by both parties is competent. The case in *Har. and Gill,* 408, shows the exception to the general rule, and that it arises from necessity. It is well established with reference to individuals, and I ask its extension to corporations. There is nothing in the fact of its being *rebutting* evidence ; *Jones* adopted *McElderry* as the agent of the company, and it would be iniquitous to exclude the evidence merely because it was rebutting.

The third exception relates to the evidence of *Norris.* In this we suppose *Jones* had knowledge of the intention of the company not to contract to carry out safely—and contracted with a sub-agent—with knowledge that the company had given no such power to their agent and intended to assume no such responsibility. Would it not exclude the authority of a general agent to enter into such a guaranty? The law presumes that a general agent might so contract, but show in fact, that the other contracting party had notice of the limitation of the agent's powers and he could not then recover. This was all one enterprise. We are inquiring into one class of contracts to throw light upon another class of contracts growing out of the same enterprise. It was the same transaction, and not *res inter alias acta,* which answers the case in *Boyle vs. McLaughlin,* 4 *Har. and John.* 291. *See* 1 *Stark. Ev.* 10, 45, 46. *Jones* was the witness of the plaintiff and

his agent. He had heard of the arrangement, and we propose to prove by *Norris* what the arrangement was. If brought home to *Jones* it must form a material inquiry in the cause. It was material as confirmatory of *Taylor's* evidence. 1 *Stark. Ev.* 527. There are no technical rules about confirmatory evidence, except to exclude suspicious evidence made *post litem motem.*

Under the fourth exception I propose to consider in connection the first and eighteenth directions prayed for by the defendants and refused by the court. These call on the court to announce the extent of *McElderry's* agency, and present two inquiries :—are not the propositions demanded correct—and were they granted in substance, by any of the subsequent directions of the court.

A general agent has no authority beyond the scope of the business confided to him. It is limited by the nature of the employment. *McElderry's* was with reference to passengers. This contract is different in all respects from any other he ever entered into. It was a new contract for employing the company's boats in a new mode. If this can be done we have misapprehended the nature of a general agency, which is a general employment in a particular business. A general authority is not an unqualified one. *White vs. Westport, C. M. Co.* 1 *Pick.* 220. *Paley*, 303.

It is said that corporations can have no general agents. *Angel and Aimes*, 107. Innocent stockholders are to be protected, and powers to agents as respects the corporation are on record either by the charter or by-laws. I do not contend for this rule as corporations may be affected by implied assumpsits. But as far as the agents are limited by its charter, they cannot bind their principals beyond it. *Bank of Columbia vs. Patterson's adm'rs.* 7 *Cranch*, 306. 1 *Cow.* 537. Every authority must be exercised according to law. Every general agent under a charter is presumed to act under its authority and in conformity with it. Upon this principle the eighteenth prayer was framed, and hence the defendants are entitled to a verdict, unless a special authority existed in

*McElderry*, or the company adopted his acts. Any other doctrine would place the company at the feet of the agent and oblige them to do what his malice or ingenuity might dictate. The proposition is monstrous, "I will not discuss it."

The tendency of the refusal of the court was to embarrass the jury, and it is material to ascertain whether in substance it is covered by any of the instructions given below. In the fifth instruction, the court did not put the plaintiff's right to recover upon the adoption of the company of *McElderry's* contract. It informs the jury what an adoption is, but does not treat of its consequences. The cause went to the jury upon the question of general agency alone, and not upon the adoption of the contract.

The sixth point in the opening statement:

Does a contract by a company out of the limits of its charter, stop the company from denying it, preclude them from contesting it, whether made under a general agency, by special authority, or adopted by the company after it is made?

The company was chartered for the conveyance of passengers and transportation of merchandise and other articles. The prayer takes the language of the charter, and concludes that if the contract was out of the charter and has no relation to it, that the plaintiff is not entitled to recover. The plaintiff contended, if the contract was out of the charter, still he could recover. The rule is of importance and big with the fate of nations. The *old* rule was, that a specification was not an *exclusion* of powers not specified.

The case in 5 *Serg. and Low.* 218, was a suit against a corporation, where they had received value and set up a want of power against equity.

The settled rule of *American* law is, that every corporation is limited as to its powers, by the objects to be accomplished—the sphere of action designated—and that a specification of the means of accomplishing its purposes, is an exclusion of all other means. 2 *Kent Com.* 239, 240. *North River Ins. Co. vs. Lawrence*, 3 *Wend.* 482. *Angel and Aimes*, 59, 60, 145. *New York Firemen's Ins. Co. vs. Ely*, 2 *Cowen*, 699.

5 *Conn.* 562; and the rule is illustrated by a variety of examples mentioned in the cases cited. It is owing to judicial foresight adopting these rules, that we now enjoy the benefits flowing from the use of corporate powers. What sort of propriety is there in the application of the doctrine of estoppel to such a case? The other view is protection of public rights, and keeps corporations within their restricted spheres, and why should the court close its ears to it. A corporation is a legal entity; out of its charter it has no existence. An objection derived from a want of power, is of a legal disability. Was there ever an estoppel against a legal disability? Infancy, usury and gambling are never closed by estoppel. The idea is, that both plaintiff and defendant must close their eyes, bind the courts and conclude the law. There is no estoppel against a statute. 2 *D. and E.* 171. This is a highly instructive case, in which a corporation sued to disaffirm its own acts and recovered. It is as easy to estop a corporation as to its existence as to its powers, and then what becomes of the principle, that a corporation must act within its charter? Estoppels are reciprocal; yet it is fully settled that *Dandridge* as defendant could have shown, that this company could not have entered into this contract, and so turned the company out of court. Then answer the case from 16 *Mass.* The reciprocity of the estoppel relied on fails. *Clark vs. Mayor, &c. of Washington,* 12 *Wheat.* 40. *Welland Canal Co. vs. Hathaway,* 8 *Wend.* 484. There is no analogy between the doctrine and the proceeding for a forfeiture of the charter. The company is kept by it within its limits—restrained to its charter, but its existence is not forfeited. The proposition intended to be submitted to the jury was, whether the contract had any relation to the business of the company—the jury could not have hesitated. It is limited both by the termination and its objects. It was not established to break ice and become towers of vessels. The distinction is manifest between the charter and that of the Steam Towing Company.

The seventh point of the statement is open here under the

court's fifth direction to the jury. It is a question of adoption of the contract by the defendant. The instruction is that mere payment over of the money received by the agent from plaintiff—its receipt and intention under all the circumstances is an adoption of the contract without reference to the knowledge of the principal. Since this is the broad view of the court, I have a right to test it by a reference to any statement of facts, showing the ignorance of the principal. *Beall, et al vs. Cunningham,* 3 *Peters,* 69. *Owings vs. Hull,* 9 *Peters,* 629. *Penn and another vs. Harrison, et al,* 3 *Term. R.* 757.

Upon the motion in arrest of judgment two questions arise :—

1. As to the insufficient description of the goods damaged.

2. As to the want of averment of a sufficient consideration to sustain the contract.

I leave the first question on the argument of my colleague. Upon the second question. In the action of assumpsit the agreement and its elements are essential and traversable. The plea of *non assumpsit* puts in issue every thing of the essence of the declaration. Every thing of the essence of the undertaking should be averred. Consideration is of the essence of assumpsit, and if none is shown, it is a fatal defect in every stage of the cause. *Gould on Plea.* 503, *sec.* 22. 1 *Chitty,* 328. There are two classes of contracts—bi-lateral, or uni-lateral, and founded either on an executed or executory consideration—a promise on each side or a promise on one side and assent on the other. It depends on the nature of the agreement, how the pleadings are framed. In cases of promise for promise each promise is necessary to be stated, for each is of equal import in sustaining the action. The reason for averring one applies to the other.

When the agreement is uni-lateral, the act to be done is as essential to be stated, is as material, as the promise in the other case. It is the condition precedent. The promise in one and the act done by the other are material to the action.

In all motions in arrest, the evidence is out of consideration, and the case is to be considered as if the exceptions

were not in the record. *Addington vs. Allen*, 11 *Wend.* 384. Then this nar is either for a promise founded on a promise, or a promise founded on an act.

As a promise in consideration of a promise. How is the promise of the plaintiff set forth? It is no more than a promise by the defendant with the reasons for it—a mere statement of a conditional promise on the part of the plaintiff. In cases of promise for promise, both are essential. They are facts of the same character—tend to the same end. Each is essential to show the obligation of the other. *Chandler vs. Rossiter*, 10 *Wend.* 491. 1 *Chitty*, 329. The court will not infer an *assumpsit* after verdict—and certainly not except where the agreement on both sides is stated. 1 *Chitty Plea.* 321. The case of mutual promises to marry illustrates the rule. 2 *Chitty*, 321. A nude pact is not aided by proof. Under this nar the plaintiff need only prove the agreement of the defendant.

In truth, however, this is not a case of promise for promise. It is a uni-lateral promise, where the promise of the defendant is founded upon an act to be done by the plaintiff, and the act to be done is not stated. Then it is the doing of the act which constitutes the consideration. Conditions precedent must be averred. 1 *Chit.* 351. This is a case without a cause of action set forth, which is fatal before or after verdict. 1 *Saun.* 158. *Gould*, 504. The contract stated is to take the vessel and carry her in safety through the ice, for which the defendant is to be paid *a priori*. This is a contract of insurance. If the sum is not to be paid until the work is done, why is it in consideration of it, the defendant was to insure the vessel through the ice? It is in the nature of premium, and the work was not to be done until money paid. If the consideration is executory you must show that the party would have had the full benefit of his agreement, and therefore aver the promise *before* to do the act subsequent. There is no middle class. The cases are promise for promise, or promises in consideration of an act to be done. This motion is entitled to favour. It is not a case of sleeping

and laying by.    This nar was assailed from the first moment of trial.

With regard to a statement of mutual promises you must show, not only their existence, but their binding character on both parties.    1 *Chitty Plea.* 323.

The ninth point is raised by the eleventh, thirteenth, and fifteenth prayers.

These prayers concede that the agreement may have been as proved by *Jones,* and the right to legal or ordinary damages, but the sole question here is as the consequent injury, loss of goods—and this involves— .

1st. The plaintiff's power to save himself by his own exertions.

2d. His obligation to save himself through the defendants' exertions.

The thirteenth prayer proposes the second proposition above stated for consideration.    The means of escape offered to the plaintiff and refused.

The principles were admitted by the court, but their application was refused.

Under these circumstances if the defendants' prayers had not been made, we might have had the benefit of those principles upon the court's instructions.    But the court's directions to the jury taken in connection with the rejected prayers deprives us of that benefit.    The court excluded our specific propositions, and hence in the consideration of the general instructions, though these cover the specific propositions, yet as the specific prayers were rejected, so the effect of the special means of escape from liability was not urged before the jury.

The general directions only relate to obligations to save them by their own exertions.    The error of the court was in supposing that the crew of the *Hunter* could only exert themselves in one direction, the downward track, and not applying the rule to their obligation to come back, which is important upon the question of consequential damages.    They were lying on a freezing night of an almost Russian winter, the captain

and crew alarmed—some of them flying off under the apprehension of danger—the cargo in peril, and the plaintiff refuses the offer to come back with the vessel and the lost goods.

And lastly, there is a variance between the contract as alleged and proved. That alleged was against all risks, that proved was alone against danger from ice.

DORSEY, Judge, delivered the opinion of the court.

The object of all pleadings is that the parties litigant may be mutually apprised of the matters in controversy between them. The declaration should substantially present the facts necessary to constitute the plaintiff's right of action, that the defendant being thereby forewarned of the nature of the proof to be preferred against him, may, if necessary, be prepared to contradict, explain or avoid it. The motion in arrest of judgment presents the question, as to the sufficiency of the *nar* filed in this case. After stating the "loading of certain goods, chattels, wares, and merchandise," on board the schooner *Hunter*, without further specification thereof, it alleges, that the defendants undertook and faithfully promised the said plaintiff, that they, the said defendants, for and in consideration of the sum of thirty-three dollars and thirty-three cents, to be paid by the said plaintiff to the said defendants, would safely and securely take the said schooner or vessel so loaded as aforesaid, with the goods and chattels of the said plaintiff, from and out of the ice, and from and out of the harbour and port of Baltimore aforesaid, to and at such point, or place of safety, in the said river or bay, below where the same was frozen, and below where the navigation thereof was obstructed by ice as aforesaid, by breaking the said ice, and towing the said schooner or vessel to such point or place of safety as aforesaid. Yet the said defendants, not regarding their said promise and undertaking, and not regarding their duty in this behalf, afterwards, to wit, on the day and year aforesaid, at the county aforesaid, neglected and refused so to do, although thereto requested by the said plaintiff, whereby and by reason of the negligence and improper

conduct of the said defendants, and their agents, the said schooner or vessel was injured, stranded, and lost; and the aforesaid goods and chattels, wares and merchandise of the said plaintiff, became and were greatly broken, damaged and destroyed, and wholly lost to the said plaintiff.

The first reason assigned for arresting the judgment is, because the plaintiff's declaration does not show, or allege, any consideration for the defendants' undertaking and promise therein declared upon. This objection we think well founded, and is fatal to the plaintiff's right of recovery in the present state of his pleadings. The declaration sets out the promise and undertaking made by the defendants, but it alleges no agreement entered into between the plaintiff and defendants; it states no promise or obligation on the part of the plaintiff to pay the $33.33. Every allegation in the declaration may be true, and may have been proved on the trial, and yet no evidence has been offered to shew that there ever was any agreement between the parties, or promise by the plaintiff to pay to the defendants the sum they required as the consideration for their services to be rendered. Their promise then was a *nudum factum*, and no action would lie for their refusal to perform.

We do not think the second reason assigned for the reversal of the judgment, can be sustained. The plaintiff was under no obligation to pay until the services were rendered. The performance of their part of the agreement, had such an agreement as is alleged been entered into, is a condition precedent to the right of the defendants to demand the stipulated remuneration.

The opinion of this court upon the third reason assigned, is sufficiently expressed in our views on the two preceding reasons.

The motion in arrest we also think supported by the fourth reason. To enable the defendants to make the requisite preparations to meet the proof against them, in a case like the present, some more certain and definite description should have been given of the cargo, than that of "goods, chattels,

wares and merchandise." See *Candler & Hart vs. Rossiter,* 10 *Wend.* 487. *Gould's Pl.* 503. *Stephen's Pl.* 348. *Martin vs. Henrickson,* 2 *Ld. Ray,* 1007. *Wiatt vs Essington,* 2 *Ld. Ray,* 1410.

We next approach the questions raised on the several bills of exceptions taken in the county court, and first as to the admissibility of the testimony *offered* to be adduced as stated in the first bill of exceptions. In our opinion the county court erred in admitting the testimony offered to go to the jury. It was inadmissible under the pleadings in the cause, because the facts, in proof of which it was offered had not been put in issue. The declaration simply charges the promise and undertaking of the defendants, their neglect and refusal to comply therewith, upon the request of the plaintiff, and that thereby the loss was produced. These were the only facts in reference to this exception put in issue by the defendants' plea of *non assumpsit.* To meet proof in support of them, he was bound to come prepared ; but not to defend himself against a cause of action resting on facts essentially different from those put in issue. The charge alleged was in substance a total neglect and refusal by the defendants to perform their undertaking, whereby the loss accrued. The evidence offered was by necessary implication to contradict such charge, and to shew that the defendants had not wholly neglected and refused to fulfil their promise, but that they had in part executed their engagement, yet in a manner so negligent, imperfect and improper, that the vessel and cargo were exposed to perils, to which but for such conduct they would not have been subject, and that thereby the loss accrued. Can it be said that in permitting such testimony to go to the jury, the sage and venerable maxim of the common law, " that the *allegata et probata* must correspond," would not have been violated. The materiality and importance of the proof in question upon the verdict of the jury, is manifested by the fact, that with it they gave a verdict for the plaintiff for $2,347.79 ; without it their verdict could only have been for nominal damages. It is true the plaintiff has alleged that

the loss occurred not merely from the neglect and refusal of the defendants to perform their contract, but by reason of the negligence and improper conduct of the said defendants and their agents : but it has not been even suggested in the argument for the appellee, that so general and indefinite a statement, without any specification of the acts of negligence and improper conduct complained of, would license the introduction of the testimony offered. Under the declaration before us, the plaintiff's right of recovery was limited to such damages only as naturally resulted from the defendants' total neglect and refusal to perform their contract; he was not at liberty to inflame them by the evidence alleged to have been *offered* in the first bill of exceptions.

In the argument on the part of the appellants, it has been urged that the contract proved in evidence, varies from that alleged in the declaration, and therefore was inadmissible before the jury. Two variances have been suggested : the first is, that the *nar* states to tow out the vessel and cargo safely and securely, which would cover losses from any and every cause, and the proof is of a contract to tow out the vessel and cargo, "free of damage of ice." This objection would be well founded if the defendants were in a condition to avail themselves of it in this court. The second variance is that the declaration states the consideration to be paid for towing out, to be $33.33, and the proof states it to be $33.33⅓. The variance alleged is one-third part of a cent. If this question were properly before us, we should hesitate long before we would declare that a difference between the allegata and probata of one-third of a cent, to represent which we have no coin, currency, or means of payment, was a fatal variance. But neither of these questions of variance are presented for our determination. The proof of the contract never was objected to in the county court, and surely since our act of assembly of 1825, such a question of variance cannot be raised in this court. The testimony to which objection was taken in the first bill of exceptions, was not that which proved the contract, but that which was "*offered*"

OF MARYLAND. 315

The Penn. Del. and Md. Steam Navigation Co. *vs.* Dandridge.—1836.

to prove its imperfect execution, and the consequences ensuing. As authorities sustaining some of the views of this court on the points raised on the first bill of exceptions, see *Archbl. Civ. Pl.* 170. *Doans vs. Badger,* 12 *Mass.* 69. 2 *Stark. Ev.* 815. 1 *Stark. Ev.* 366. 2 *Chit. Pl.* 329 *to* 331. *Fitzsimmons vs. Ingles,* 5 *Taunt.* 534.

We concur with the county court in their rejection of *McElderry* as a witness for the purpose for which he was offered. Although it has been in many cases determined that an agent is from necessity a competent witness to prove the terms of a contract made by him, even though in his character of agent he may gain or lose by the event of the suit, yet we have met with no case in which it has been held that a person having a direct interest in the event of the suit, independently of his acts as agent, can by being employed as agent, be rendered a competent witness to prove even the acts of his own agency. If the principle contended for in this case were sanctioned, it could scarcely be called an extension of the doctrine to say, that a co-partner selling for his firm, was a competent witness to prove the sale and the terms thereof, or that the like facts might be proved by an owner himself who disposed of his own property without the intervention of an agent. To this length we do not feel inclined to extend this principle of necessity, but rather concur with a learned commentator on the law of evidence, who in treating on this subject says, it is to be remarked that the law has been justly jealous of any extension of this rule, and that its operation, in consequence, has been very limited in practice. 2 *Stark. Ev.* 753.

The only question presented by the third bill of exceptions, is as to the admissibility of the testimony of *Norris.* It is correctly stated in 1 *Stark. Ev.* 46, that all the surrounding facts of a transaction, or as they are generally called, the *res gestæ,* may be submitted to a jury, provided they can be established by competent means, and afford any fair presumption or inference as to the question in dispute. The matter here in dispute in relation to which this evidence was

offered, was, what were the terms of the contract between the plaintiff and defendants below, for the towing of the *Hunter* and her cargo out of the ice by the steamboats of the defendants. It was no part of the usual employment of their steamboats, or of the business of the defendants, but was an isolated enterprise in which they had consented to engage, not with a view to profit, but to accommodate the owners of vessels confined in the *port of Baltimore* by the ice, and they demanded nothing more for their services than reimbursement for the probable cost of the enterprise. That the amount paid by each owner was in proportion to the tonnage of his vessel, and that it was the distinct understanding of the witness, at whose instance this enterprise was entered into by the defendants, at the time it was entered into, that they were to be at no risk, and were not to be paid any thing if they did not succeed in the enterprise. That the defendants expressed much reluctance to accede to this arrangement, and finally agreed to it on condition that a number of vessels offered to be towed sufficient to bear the cost of the enterprise; that a sufficient number was accordingly procured. In determining on the admissibility of the testimony offered, it must be conceded, that all these facts and circumstances would have been established by the witness to the satisfaction of the jury. It must also be conceded as a fact recognized by the common sense of every man, that a vessel with a cargo on board requires a greater power to tow her out than one of the same tonnage without cargo. The verity of *Captain Taylor's* evidence must also be conceded. Assuming then, the truth of the facts and existence of the circumstances enumerated, let us test their admissibility by the rule of evidence laid down by *Starkie.* Do they afford any fair presumption or inference as to the question in dispute? In our opinion they do. The testimony of *Captain Taylor* is sufficient to warrant the jury, if they saw fit to do so, in finding that *Jones* knew before he entered into any contract for the towing out of the plaintiff's vessels, what the terms of the arrangement were. Without such knowledge is it to be pre-

sumed, that without making the slightest inquiry as to the terms, he would have directed the president of the company to "set him, *Jones*, down for two vessels?" Or if the jury should not find such antecedent knowledge in *Jones*, the proof of *Captain Taylor* was sufficient to justify the jury in finding a perfect willingness to assent to his vessels being towed out upon the same terms which by the arrangement were imposed on all other owners. *Taylor* also proves that *Meeteer*, after he had been directed by *Jones* to set down his two vessels, told him, "that the company would not be at any risk nor responsible for the property." With this communication, *Jones* does not appear to have expressed either surprise or dissatisfaction, nor does he countermand his order to set him down for two vessels. Standing alone, might not the inferences deducible from *Taylor's* testimony, be legitimately urged on the jury, as if not wholly irreconcileable with *Jones'* proof of his contract with *McElderry*, at least as casting on it a shade of suspicion as to its accuracy? Is it probable that *Jones* would have exacted such terms? Was it an act of fair dealing in *Jones*, after acceding to the terms upon which alone the defendants assented to act, to procure from their agent a contract which they never authorized, and which was a wanton sacrifice of their interests? Was it probable that their agent ever entered into such a contract? Connecting these probabilities as to the accuracy of *Jones* in relation to the contract, with the testimony of *Norris*, that the defendants were to be at no risk—that each vessel paid in proportion to tonnage, and consequently that nothing was paid to the defendants for towing out the *Hunter's* cargo, nothing for the alleged insurance of either vessel or cargo, can it be contended, that all the facts and circumstances adverted to, when weighed in connection, were not proper to be submitted to the jury to find if they saw fit to do so, that *Jones* had mistaken or mis-stated the terms of the contract on which the plaintiff had rested his right of recovery?

But there is another aspect of this question, in which we think the testimony of *Norris* ought to have been received.

*Jones* had sworn that he had made one contract with *McElderry*. *Taylor* had sworn that the contract was made with *Meeteer*, and it was the province of the jury, not of the court, under all the facts and circumstances surrounding the matter in controversy (of which those detailed by *Norris* were a very material part,) to determine between whom the contract was made and what were its terms. To enable them to do this, the testimony of *Norris* was not only admissible but indispensable. We therefore think the county court erred in rejecting it. The case referred to by the appellee's counsel, of *Boyle, et al vs. McLaughlin,* has no bearing upon the question now before us. The court's rejection there of the clerk's testimony, in the fourth bill of exceptions is unquestionably correct, as had he proved that the habitual communications of *Boyle,* which he detailed, had been made to *McLaughlin* himself at the time of their contract, they could not have been received in evidence, being offered to alter and change the written contract between the parties.

We think the county court erred in refusing the appellants' first prayer in the fourth bill of exceptions; the instruction which was asked from the court to the jury being the natural inference both of law and fact, not only to the extent of the prayer, but perhaps further might their instruction have been extended. In the law of *Prin. and Agent,* 259, it is stated, that by a general agent is understood not merely a person substituted for another for transacting all manner of business, but a person whom a man puts in his place to transact all his business of a particular kind, as to buy and to sell certain kind of wares, to negotiate certain contracts and the like.

The second direction also at the instance of the defendants ought to have been granted by the court below. In *Angel and Ames on Corp.* 139, it is justly observed, that a corporation and an individual stand upon very different footing. The latter existing for the general good of society may do all acts and make all contracts which are not in the eye of the law, inconsistent with the great purpose of his creation; whereas, the former having been created for a specific pur-

pose, cannot only make no contract forbidden by its charter, which is as it were the law of its nature, but in general, can make no contract which is not necessary either directly or incidentally to enable it to answer that purpose.

In deciding therefore whether a corporation can make a particular contract, we are to consider in the *first* place, whether its charter or some statute binding upon it forbids or permits it to make such a contract; and if the charter and valid statutory law are silent upon the subject, in the *second* place, whether a power to make such a contract may not be implied on the part of the corporation as directly or incidentally necessary to enable it to fulfil the purpose of its existence; or whether the contract is entirely foreign to that purpose. In page sixty of the same book it is stated, " that a corporation has no other powers than such as are specifically granted, or such as are necessary for the purpose of carrying into effect the powers expressly granted, " and that a corporation is confined to the sphere of action limited by the terms and intention of the charter."

According to these wise and now well established principles the appellants had no power to bind themselves by such a contract as that attempted to be enforced against them, and possessing none themselves they could not delegate it to *McElderry*, their agent. At the instance of the defendants then the court should have granted the direction prayed for. The instruction should have been given if required without the qualification attached to it; but it is no ground for refusing the prayer of a party because he asks less than he is entitled to at the hand of the court.

It has been urged that the defendants having entered into this contract are estopped from denying their competency to have done so. To the doctrine of estoppel applied to such cases we cannot yield our assent. If the corporation is estopped from denying its power, the estoppel operates with like effect upon those who contract with them, and the result would be that no matter how limited the design and powers of a corporation may appear in its charter, practically it is a

corporation without limitation as to its powers. Such a doctrine at this day is dangerous to the interest of the community, and is at war with the modern decisions upon the subject. We therefore think the county court erred in refusing the second direction prayed for by the defendants. 5 *Cowen, Rep.* 560. *New York Fire Ins. Co. vs. Ely,* 15 *John.* 383. *The People vs. Utica Ins. Co.* 3 *Wend.* 482. *The North River Ins. Co. vs. Lawrence,* 4 *Kent Com.* 240. *New York Fire Ins. Co. vs. Ely and Parsons,* 2 *Cowen,* 678. *Broughton vs. Salford Water Works,* 1 *Eng. Com. L. R.* 215.

We think the court erred also in refusing to give the defendants' third and fourth directions for the reasons assigned by us in the consideration of the first bill of exceptions.

We think the court erred too in denying to the defendants their *seventh* direction. Could they have lawfully assumed the obligations imposed on them by such a contract as under this direction it was left to the jury to find, they were not answerable to the same extent that common carriers would have been. They were only bound to use reasonable efforts, care and diligence in the execution of their undertaking. *Caton vs. Rumney,* 13 *Wend.* 387.

We concur with the county court in refusing to give the eighth direction contained in the fourth bill of exceptions. As far as that direction is concerned the defendants admit the legal validity of their contract, but require the court to instruct the jury that if they believe the facts therein enumerated, that then the plaintiff is not entitled to recover. These facts do not *per se* justify such a verdict as the court were called upon to direct them to give. Such an instruction could not have been given to the jury without withdrawing from them the determination of other facts, indispensable to such a finding as they were called on to make. Before such a direction could be given the court must have assumed as facts so conclusively proved as not to be left open for the consideration of the jury, that the defendants had used all reasonable efforts, care and diligence to tow the *Hunter* and her cargo through the ice. The proof in the cause by no

means warranted such an assumption on the part of the court, and it rightfully therefore refused to withdraw from the jury the determination of those disputed facts, on which it was their exclusive privilege and duty to decide.

For the same reasons the court were right in refusing to grant the plaintiff's *eleventh* direction.

The court below were right in refusing the *thirteenth* direction. It assumes without assigning any reason therefor, that it was not the duty of the defendants' steamboats upon their return up the track to tow out the *Hunter* and her cargo which had been left behind by misadventure. In the absence of all adequate excuse for not doing so, if the jury believe the contract as proved by *Jones*, it was the duty of the steamboats on their return to have towed out the *Hunter* and her cargo. This direction is not supported as has been supposed by the case referred to in 13 *Wendall.* Here the voyage, the business of the steamboat, was to tow the vessels safely out of the ice; according to *Jones'* testimony they were bound to use all reasonable efforts within their power to accomplish that end. In the case in *Wendall* the steamboat was bound on a regular trip from port to port. With a knowledge of this fact, the plaintiff, the owner of a small boat, applied to the master of the steamboat to tow his freight boat down to the steamboat's port of destination. The master told him he thought his boat was too heavily laden to be towed down, as the south wind was rising. The plaintiff said he was very anxious to get down, and he must and would go, and accordingly fastened his boat to the steamboat and the vessels proceeded on their voyage. The plaintiff's boat filled with water and sunk, and the court determined that the master of the steamboat was only answerable for reasonable care and diligence, and the court predicate their opinion upon the ground that the master of the steamboat was not the insurer of the plaintiff's boat, and th▮▮fore ordinary care and diligence was all that was requir▮ ▮f him. But the inference is irresistible, that if there as▮ ▮, according to the proof of *Jones*, the defendant had be▮ ▮nsurer of

41      v.8

the plaintiff's vessel, he could not have discharged himself but by the use of extraordinary care and diligence.

The county court erred in refusing to grant the defendants' *fourteenth* direction. If the jury had found the facts submitted to them by the prayer, the agents of the defendants had used all the efforts to perform their contract, which under the circumstances of the case were imposed on them by law, consequently the plaintiff had no cause of action against them. ·

We think the county court were right in refusing the *fifteenth* direction of the defendants; as to discharge the defendants under it, the jury must be satisfied that the loss was occasioned by the default or misconduct of the agents of plaintiff, and this fact is not committed to the finding of the jury with that distinctness and certainty, with which it ought to have been. It is true the jury were required to find that the commander of the *Hunter* was aware of the danger of his situation. But the magnitude of the danger they were not required to find. Their verdict was to have been the same, whether the danger was such as to render the loss of the vessel in the highest degree probable, and would therefore have been avoided by every commander of ordinary skill and prudence, or whether the danger of loss was so light and trivial, that under the circumstances in which the *Hunter* was placed no commander of ordinary skill and prudence would have suffered her to be towed back to the port of *Baltimore.* The court should have granted the direction prayed; provided, that in addition to the facts submitted to them, the jury also found that such was the perilous situation of the *Hunter*, that no commander thereof of ordinary skill and prudence would have refused to avail himself of the offer of being towed back to the city of *Baltimore.*

The court below erred in rejecting the defendants' *sixteenth* instruction, for the reasons assigned by this court in disposing of the first bill of exceptions.

The county court we think were clearly right in refusing to grant the defendants' *seventeenth* direction upon this ob-

vious ground if all others were wanting: There was no evidence to have been left to the jury to find the fact, that at the time *Jones* contracted with *McElderry* for the towing out of plaintiff's vessels, he knew the steamboats were under contract to tow other vessels up the track on their return to *Baltimore.*

The county court in our opinion erred in refusing to instruct the jury as required by the defendants' *eighteenth* and *nineteenth* directions, for the reasons we have given in examining the correctness of the county court's refusal of the *second* direction.

We think also that the court below erred in their *fifth* opinion and instruction to the jury, as to what facts it was necessary to find, to shew that the defendants had adopted and ratified the contract alleged to have been made between *Jones* and *McElderry.* The cause of action in this case arose after the 20th December, 1831, and the suit was instituted in less than ten days thereafter. It was offered that the defendants ever had any knowledge of the terms of the contract proved by *Jones,* to have been made by him with *McElderry,* or that the agent who collected the money for the towing out of the plaintiff's vessels paid the defendants the amount collected by him, or communicated to them the fact that any such money had been collected, or on what account it was collected. The court however instructed the jury, if the consideration for the towing out of the plaintiff's vessels, as agreed on between *Jones* and *McElderry,* was collected by one of the defendants' agents, on their way out of the ice, and paid over to the defendants, who have ever since retained the same, as also all the other money that was received from the other vessels towed out of the ice at the same time, " that then the said facts are in law an adoption of the contract, under which said money was paid by plaintiff, and that said contract is as binding on defendants as if there was clear evidence of a precise authority from defendants to *McElderry,* to enter into said contract on their account. This instruction is erroneous on two grounds.

*First*, that the jury were not required to find that the defendants knew on what account the money paid to them was received. *Secondly*, that the defendants knew the terms of the contract on which the money was received. If the jury failed to find either of these facts, and they were not instructed that the finding of either was necessary, they were not at liberty to find, nor is it an inference of the law that the defendants adopted the contract under which the money was paid. See *Bell and others vs. Cunningham, et al*, 3 *Peters*, 69. We concur with the county court in its opinion on the second bill of exceptions and in the rejection of the *eighth*, *eleventh*, *thirteenth*, *fifteenth*, and *seventeenth* directions asked by the appellants in their fourth bill of exceptions; but dissenting from its *pro forma* decision on the motion in arrest of judgment, and from its decisions on the *first* and *third* bills of exceptions, and from its refusal to grant the *first*, *second*, *third*, *fourth*, *seventh*, *fourteenth*, *sixteenth*, *eighteenth*, and *nineteenth* directions prayed for by the appellants in their *fourth* bill of exceptions, and also dissenting from the *fifth* opinion and instruction given by the county court to the jury, we reverse their judgment.

As the appellee in no aspect of his case is entitled to recover; no *procedendo* will issue.

JUDGMENT REVERSED.